1   DAVID ZARMI
    California Bar No. 245636
2   8950 W Olympic Blvd., Ste. 533
    Beverly Hills, CA 90211
3   310-841-6455
    davidzarmi@gmail.com
4
    *Attorney for Defendant*
5   Eretz Chico Properties, LLC

6

7                    **UNITED STATES DISTRICT COURT**

8                    **EASTERN DISTRICT OF CALIFORNIA**

9
    GRACE SHUMLAI, deceased, by and through her          Case No. 2:22-at-00211
10  personal legal representative and successor in    )
    interest, TERRY LEWIS; and TERRY LEWIS,           )  **DEFENDANT'S NOTICE OF REMOVAL**
11  individually,                                      )
                                                       )  **[Re: Butte County Superior Court Case No.**
12                 Plaintiffs,                          )  **21CV02507]**
                                                       )
13         vs.                                          )
                                                       )
14                                                      )
    GLAD INVESTMENTS, INC. dba RIVERSIDE               )
15  CONVALESCENT HOSPITAL, a California                )
    Skilled Nursing Facility; ERETZ CHICO             )
16  PROPERTIES, LLC, THE GLADYS V.                    )
    JENNINGS REVOCABLE TRUST, a Trust; and            )
17  DOES 1-25, inclusive,                              )
                                                       )
18                 Defendants,                          )
                                                       )
19  -and-                                               )
                                                       )
20  GARY SHUMLAI, an individual,                        )
                                                       )
21  Nominal Defendant.                                  )

22

23

24

25

26

27

28

Defendant's Notice of Removal of Civil Action

COMES NOW, Defendant ERETZ CHICO PROPERTIES, LLC ("Eretz Chico"),[1] by and through its undersigned counsel, hereby remove this action from the Superior Court of the State of California, County of Butte, to the United States District Court for the Eastern District of California, reserving all defenses and reserving all objections to venue based on 42 U.S.C. § 247d-6d(e)(1), pursuant to 28 U.S.C. §§ 1441, 1442, and 1446, on the following grounds:

## I.        STATEMENT OF THE CASE

1.        This action was filed in the Superior Court of the County of Butte, California as Case No. 21CV02507 on October 6, 2021.  (Ex. A, Summons & Complaint.)

2.        Eretz Chico was served with the Summons and Complaint on February 3, 2022.  (Ex. E, Proof of Service of Summons.)  Accordingly, this Notice of Removal is timely.  *See* 28 U.S.C. § 1446(b); Fed. R. Civ. Proc. 6(a)(1).

3.        The Complaint asserts causes of action for (1) elder abuse and neglect; (2) Violation of Patient Rights; (3) Negligence; and (4) Wrongful Death resulting from alleged misconduct by a covered person in the administration of a covered countermeasure under the Public Readiness and Emergency Preparedness Act (["PREP Act"], 42 U.S.C.A. §§ 247d-6d(d), 247d-6.  (Ex. A, Complaint at 1.)

4.        More specifically, Plaintiffs claim that Eretz Chico owner and operator of a California licensed nursing facility ("Riverside"), engaged in negligent, willful and/or reckless conduct in the care rendered to Grace Shumlai ["Decedent"] in relation to exposure, diagnosis, and treatment of COVID-19 and in the distribution, administration, or use of medical countermeasures, like COVID-19 testing and personal protective equipment, to prevent the spread of COVID-19 and as a result thereof he died.  (*See, e.g.*, Ex. A, Complaint at 10-12.)

---

[1] Plaintiffs have erroneously named as co-defendants GLAD INVESTMENTS, INC. and THE GLADYS V. JENNINGS REVOCABLE TRUST, respectively previous operator and owner of Riverside Convalescent Hospital.

Defendant's Notice of Removal of Civil Action

5.      The Complaint seeks damages including, compensatory damages, special damages, statutory damages, punitive and/or exemplary damages, interest, attorney's fees, and costs of suit.  (Ex. A, Complaint at 25-26.)

## II.      PROCEDURAL REQUIREMENTS

6.      This notice is filed on behalf of Eretz Chico in the above-styled case pursuant to 28 U.S.C. § 1446(b)(2)(A).

7.      Concurrent with the filing of this Notice or promptly thereafter, Eretz Chico is serving this Notice of Removal on all other parties pursuant to § 1446(d).

8.      Pursuant to § 1446(a), copies of pleadings and documents from the Superior Court for the County of Butte served upon or provided to Eretz Chico are attached as Exhibit A.

## III.      FEDERAL QUESTION JURISDICTION UNDER 28 U.S.C. § 1441(a)

9.      This case is removable under 28 U.S.C.A. § 1441(a) on the basis of original jurisdiction because Plaintiffs assert a claim arising under federal law withing the meaning of § 1331.

10.      On its face, the allegations contained in the Complaint reflect that a "covered person" was involved in "recommended activity" relative to a "covered countermeasure" and therefore presents a federal question under the PREP Act, 42 U.S.C. §§ 247d-6d, 247d-6e.

11.      As such, Congress provided an exclusive remedy for the substance of the allegations, and relief sought in the Complaint and Federal law expressly pre-empts state law for purposes of federal question jurisdiction.  §§ 247d-6d, 247d-6e.

12.      Federal courts have found "complete preemption" where a federal statute expressly preempts state law and creates an exclusive federal remedy for preempted state claims.  *See, e.g.*, *Fossen v. Blue Cross & Blue Shield of Mon., Inc.*, 660 F.3d 1102, 1107 (9th Cir. 2011); *In re WTC Disaster Site*, 414 F.3d 352, 380 (2d Cir. 2005); *Spear Marketing, Inc. v. Bancorp South Bank*, 791 F.3d 586 (5th Cir. 2015); *Nott v. Aetna U.S. Healthcare, Inc.*, 303 F.Supp.2d 565 (E.D. Pa. 2004).  Further, federal defenses that will be asserted by defendants are sufficient to invoke complete preemption.  *Jefferson Cty. v. Acker*, 527 U.S. 423, 431 (1999).

Defendant's Notice of Removal of Civil Action

13.     Here, as set forth below, Eretz Chico asserts that the claims alleged in the Complaint and the defenses to them are completely preempted by the PREP Act sections found at §§ 247d-6d and 247d-6e.  *See Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 253 (2011) (Sotomayor, J., dissenting) (where the majority found the National Childhood Vaccine Injury Act preempted state law, Justices Sotomayor & Ginsburg further analyzed that the PREP Act unequivocally demonstrated intent to completely preempt state law through its use of "categorical (e.g., 'all') and/or declarative language (e.g., 'shall')").

14.     Under § 247d-6d(a), a "covered person" is afforded broad immunity for all "claims for loss arising out of, relating to, or resulting from" the "administration" or "use" of a "covered countermeasure" as those terms are defined by that section, provided the Secretary of the Department of Health and Human Services (HHS) issues a declaration to that effect.

15.     For all claims barred by immunity under § 247d-6d that do not assert "willful misconduct," the exclusive remedy for relief is established under § 247d-6e, which permits an individual to make a claim for benefits through the Countermeasures Injury Compensation Program, also known as the Fund, for a "covered injury directly caused by the administration or use of a covered countermeasure."  In fact, and for purposes of illustrating Congress's intent to address all claims, even a claimant alleging "willful misconduct" must first apply for benefits through the Fund under § 247d-6e before bringing an action under § 247d-6d(d).  § 247d-6e(d)(1).  Further, even where a plaintiff has alleged willful misconduct and exhausted his remedies relative to the Fund, such plaintiff is limited to "*an exclusive Federal cause of action*" for willful misconduct "maintained only in the United States District Court for the District of Columbia."  § 247d-6d(d)-(e)(1) (emphasis added).

16.     Moreover, under § 247d-6d(b)(8), state law that "is different from, or in conflict with, any requirement applicable [for immunity]" is expressly preempted.

17.     Therefore, Congress has clearly manifested the intent to preempt state law with respect to claims or defenses that invoke PREP Act immunity and to create an exclusive federal remedy for such preempted claims, thereby "completely preempting" state law for purposes of federal question jurisdiction.  *See Bruesewitz*, 562 U.S. at 253.

18.     Here, as alleged in the Complaint, Eretz Chico is a "covered person[s]" in that it is a SNF licensed by the State of California.  (Ex. A, Complaint at 2.)  Further, Eretz Chico, as well as its employees and affiliates are "covered persons" because each meet the requirements of a "program planner" of countermeasures under the PREP Act and are "qualified persons who prescribed, administered or dispensed" a countermeasure under the PREP Act.  This was confirmed by the Office of the General Counsel, HHS in an opinion letter dated August 14, 2020, stating that senior living communities administering covered countermeasures are "covered persons," entitled to immunity under the PREP Act by virtue of their status as both "program planners" and "qualified persons."  (Attached as Exhibit B.)

19.     Plaintiffs' claims "arise[] out of, relate[] to, or result[] from" the administration and use of a "covered countermeasure" obtained through a "means of distribution," to a "population," and within a "geographic area," or reasonably believed so by Eretz Chico, for the purpose of treating, diagnosing, curing, preventing, or mitigating COVID-19, or the transmission of SARS-CoV-2 or a virus mutating therefrom, as such terms are defined within the PREP Act, §§ 247d-6d, 247d-6e, the Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19, 85 Fed. Reg. 15198 (Mar. 17, 2020), amended by 85 Fed. Reg. 21012 (Apr. 15, 2020), and all corresponding amendments, regulations, and interpretational case law.

20.     At the time of the allegations set forth in the Complaint, and based on such allegations, Eretz Chico was acting as "program planner[s]" that supervised the infection control policy program, under which FDA-approved personal protective equipment including, inter alia, N95 respirators, face shields, and gowns as well as diagnostic countermeasures were distributed and administered to Decedent and Riverside's staff in an effort to diagnose, mitigate, and prevent COVID-19, or the transmission of SARS-CoV-2 or a virus mutating therefrom.  Further, Eretz Chico's employees and affiliates were acting as employees of "program planner[s]" that supervised and administered the infection control program that provided and used FDA-approved countermeasures on Decedent and the Norwalk staff in

Defendant's Notice of Removal of Civil Action

an effort to diagnose and mitigate COVID-19, or the transmission of SARS-CoV-2 or a virus mutating therefrom.

21.    At the time of the allegations set forth in the Complaint, and based on such allegations, Eretz Chico's employees and affiliates were acting as "qualified persons" because Eretz Chico's employees were authorized to administer, deliver, and use FDA-covered countermeasures, like personal protective equipment and FDA-approved COVID-19 devices, medication, and diagnostic tests to diagnose and prevent COVID-19, or the transmission of SARS-CoV-2 or a virus mutating therefrom.

22.    At the time of the allegations set forth in the Complaint, and based on such allegations, Eretz Chico was engaged in the management and operation of countermeasure programs in an effort to diagnose and prevent COVID-19, or the transmission of SARS-CoV-2 or a virus mutating therefrom to a "population" and within a "geographic area" specified by the Declaration under the PREP Act for Medical Countermeasures against COVID-19, 85 Fed. Reg. 15198 (Mar. 17, 2020), and all amendments thereto ("Declaration"), or reasonably believed so by Eretz Chico.  Likewise, Eretz Chico's employees and affiliates were physically providing the countermeasures to Decedent and using the countermeasures in an effort to diagnose and prevent COVID-19, or the transmission of SARS-CoV-2 or a virus mutating therefrom to a "population" and within a "geographic area" specified by the Declaration, and all amendments thereto, or reasonably believed so by Eretz Chico.  The HHS Secretary confirmed the same in a guidance letter dated August 31, 2020 that diagnostic testing for COVID-19 in senior living communities qualifies as a "covered countermeasure" triggering PREP Act immunity.  (Attached as Exhibit C.)[2]

23.    At the time of the allegations set forth in the Complaint, the respirators and PPE used by Eretz Chico were approved by the FDA as a qualified pandemic or epidemic product and were respiratory protective devices approved by the National Institute for Occupational Safety and Health under 42 CFR part 84, and were administered, delivered, distributed, and dispensed in accordance with

---

[2] Also available at https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/prep-act-coverage-for-screening-in-congregate-settings.pdf.

Defendant's Notice of Removal of Civil Action

the public health and medical response of the State of California or reasonably believed so by Eretz

Chico.  As noted above, Plaintiffs' claims "arise[] out of, relate[] to, or result[] from" the administration

and use of such "covered countermeasures."

24.     On January 8, 2021, HHS General Counsel issued new controlling authority (hereinafter

"AO 21-01," attached as Exhibit D)[3] confirming unequivocally that: (1) the PREP Act is invoked by

allegations like those in the Complaint, including alleged inaction or failure to act; (2) the PREP Act is a

"'Complete Preemption' Statute" which confers federal question removal jurisdiction under 28 U.S.C. §

1441(a); and (3) as discussed in more detail below, federal jurisdiction is separately conferred in such

cases under the doctrine articulated by the Supreme Court in *Grable & Sons Metal Prod., Inc. v. Darue*

*Eng'g & Mfg.*, 545 U.S. 308 (2005), because "ordaining the metes and bounds of PREP Act protection

in the context of a national health emergency necessarily means that the case belongs in federal court."

(Emphasis added.)

25.     AO 21-01 unequivocally states that "[t]he PREP Act is a 'Complete Preemption'

Statute," because it establishes both a federal and administrative cause of action as the only viable claim,

and vests exclusive jurisdiction in federal court."  (Ex. D at 2.)

26.     AO 21-01 rejects the notion that immunity under the PREP Act requires actual "use" of a

covered countermeasure. Specifically, AO 21-01 provides that "this 'black and white' view clashes with

the plain language of the PREP Act, which extends immunity to anything 'relating to' the administration

of a covered countermeasure."  (Ex. D at 3.)

27.     Specifically, AO 21-01 provides that "[p]rioritization or purposeful allocation of a

Covered Countermeasure, particularly if done in accordance with a public health authority's directive,

can fall within the PREP Act and this Declaration[']s liability protections.  There can potentially be

other situations where a conscious decision ***not*** to use a covered countermeasure could relate to the

---

[3] Also available at https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-
documents/2101081078-jo-advisory-opinion-prep-act-complete-preemption-01-08-2021-final-hhs-
web.pdf.

administration of the countermeasure." (Ex. D at 3, emphasis added.) Thus, "program planners" fall within the set of "covered persons" under the PREP Act and the "decision-making that leads to the ***non-use*** of covered countermeasures by certain individuals is the grist of program planning, and is expressly covered by PREP Act." (*Id.* at 4, emphasis added.)

28.     In the fourth amendment to the Declaration, the HHS Secretary expressly addressed ***inaction***, as the Secretary defined "administration" of covered countermeasures to include not only physical use, but ***non-use***, such as activities and decisions, as well as management and operation, of countermeasure programs generally. This distinction makes "explicit that there can be situations where ***not administering*** a covered countermeasure to a particular individual can fall within the PREP Act and this Declaration's liability protections." 85 Fed. Reg. 79190, 79194 (emphasis added) & 79197 (examples of such situations) (Dec. 9, 2020).

29.     Because Eretz Chico and its employees are Covered Persons and because Plaintiffs' allegations concern Eretz Chico's conscious decisions to use or not use covered countermeasures, including "implementing policies and procedures relating to infectious diseases" and PPE, the Complaint's claims and Eretz Chico's defenses squarely fall within the PREP Act.

30.     As confirmed in AO 21-01, when the PREP Act is triggered, complete preemption attaches. Indeed, "[t]he *sine qua non* of a statute that completely preempts is that it establishes either a federal cause of action, administrative or judicial, as the only viable claim or vests exclusive jurisdiction in a federal court. The PREP Act does both." (Ex. D at 2.)

31.     AO 21-01 is binding on this court, as the HHS Secretary incorporated all HHS Advisory Opinions pertaining to COVID-19 into the PREP Act's implementing Declaration itself and proclaimed that the Declaration "must" be construed in accordance with them. 85 Fed. Reg. at 79191. As such, the HHS Advisory Opinions are no longer "advisory," as they now have the same "controlling weight" as the Declaration and the PREP Act itself. Where Congress has expressly delegated interpretative authority to an agency, that agency's interpretative proclamations are controlling on the federal courts. *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 843-44 (1984). To avoid any doubt on this point, the

Secretary amended the Declaration for a fifth time, confirming again in the Declaration itself that the PREP Act is a complete preemption statute.  86 Fed. Reg. 7872, 7873-74 (Feb. 2, 2021).[4]  Congress has reinforced the Secretary's ultimate authority over these matters concerning the PREP Act, and warns that "[n]o court . . . shall have subject matter jurisdiction to review, whether by mandamus or otherwise, any action by the Secretary under [the PREP Act]."  42 U.S.C. § 247d-6d(b)(1), (4) & (7).  Thus, the federal courts must follow AO 21-01's controlling authority that the PREP Act is a complete preemption statute.

32.    AO 21-01 itself was preceded by other HHS authorities that have provided guidance to the courts in construing the PREP Act.  For example, Advisory Opinion 20-04 confirms that any individual or organization can potentially be a program planner and receive PREP Act coverage--"even grocery stores, universities, private businesses, places of worship, and private transportation providers."[5]  And, as described above, HHS issued separate guidance letters specifically confirming that residential care facilities for the elderly are program planners or qualified persons under the PREP Act when they administer or use diagnostic testing and other covered countermeasures.  (*See* n.1, *ante*.)

33.    In a recent case with allegations similar to the instant one, and following a motion to remove from California state court, the court in *Garcia v. Welltower OpCo Group LLC*, 2021 U.S. Dist. LEXIS 25738 (C.D. Cal. Feb. 10, 2021) denied the plaintiff's motion to remand and granted the defendants' motion to dismiss.  The court there found that the plaintiff's allegations included the "use and misuse of PPE" and detailed "infection control measures and procedures including symptom checking, staff monitoring and screening, and limiting visitation."  (*Id.* at *8.)  Specifically, the Court held: (1) "[t]he acts and omissions alleged by Plaintiffs appear almost verbatim in the January 8, 2021 Advisory Opinion" and, accordingly, the PREP Act applied to the plaintiffs' claims (*id.* at *14); (2) "because the OGC stated [in the January 8, 2021 Advisory Opinion] that the PREP Act is a complete

---

[4] Notably, this Fifth Amendment was done under the Biden Administration, meaning that the HHS's interpretation of the PREP Act is nonpolitical.
[5] Available at https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/AO%204.2_Updated_FINAL_SIGNED_10.23.20.pdf.

preemption statute . . . an adequate basis for federal question jurisdiction exists" (*id.*); (3) prior federal opinions holding that the PREP Act did not provide a basis for federal question jurisdiction preceded more recent guidance from the OGC (Advisory Opinion published January 8, 2021), which established that "when a party attempts to comply with federal guidelines--in this case the COVID-19 pandemic--the PREP Act would provide complete preemption" (*id.* at 10); and (4) "While the Court acknowledges that certain allegations relate to a failure to abide by local or federal health guidelines, these allegations related to momentary lapses. Taken as true, all Plaintiffs' FAC discloses are possible unsuccessful attempts at compliance with federal or state guidelines--something which the PREP Act, the Declaration, and the January 8, 2021 Advisory Opinion cover." (*Id.* at 14.)

34. Furthermore, since the *Garcia* decision, the HHS Secretary amended the Declaration a sixth time, reaffirming, "The plain language of the PREP Act makes clear that there is preemption of state law as described above." 86 Fed. Reg. 9516, 9517 (Feb. 16, 2021);[6] *see generally Rachal v. Natchitoches Nursing & Rehab. Ctr., LLC*, 2021 U.S. Dist. LEXIS 105847, *4 n.3 (W.D. La. Apr. 30, 2021).

35. Despite Plaintiffs' assertion of state law claims, because the PREP Act offers complete preemption, jurisdiction over the claims is exclusively federal. *See Beneficial Nat. Bank v. Anderson,* 539 U.S. 1, 8 (2003) ("[w]hen the federal statute completely preempts the state-law cause of action, a claim which comes within the scope of that cause of action, even if pleaded in terms of state law, is in reality based on federal law"). Thus, under preemption doctrine alone, removal is proper under 28 U.S.C. § 1441(a).

36. In addition to complete preemption, AO 21-01 confirms that the PREP Act confers separate, independent grounds for federal question jurisdiction under the *Grable* doctrine. AO 21-01 highlights the Secretary's conclusion in the Declaration that "there are substantial federal legal and policy issues, and substantial federal legal and policy interests within the meaning of [the *Grable*

---

[6] *See* n.3, *ante*, regarding the nonpolitical nature of the HHS interpretation.

doctrine] in having a unified, whole-of-nation response to the COVID-19 pandemic among federal, state, local, and private sector entities."  (Ex. D at 5 (quoting 85 Fed. Reg. at 79197).)

37.     The Advisory Opinion's interpretation of *Grable* is consistent with the Supreme Court's long-standing rule "that in certain cases federal question jurisdiction will lie over state-law claims that implicate federal issues."  *Grable*, 545 U.S. at 312.  "The doctrine captures the commonsense notion that a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law, and thus justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues."  *Id.*

38.     The *Grable* Court determined that no single, precise test exists for determining whether an embedded federal issue exists, but that, in general, a two-step process exists for determining whether a state law claim "arises under" federal law: (1) the state law claim must necessarily raise a stated federal issue that is actually disputed and substantial; and (2) federal courts must be able to entertain the state law claims "without disturbing a congressionally approved balance of state and federal judicial responsibilities."  *Grable*, 545 U.S. at 314.  Here, both prongs are satisfied.

39.     First, Plaintiffs bring a claim as a result of Eretz Chico's alleged use or administration (or nonuse or non-administration) of covered countermeasures in connection with the care and treatment of the Decedent, which necessarily implicates disputed and substantial federal issues.  *See* 42 U.S.C. § 247d-6d.

40.     Second, as confirmed by the Advisory Opinion and the Declaration, the PREP Act expresses a clear intention to supersede and preempt state control of the very issues raised by Plaintiffs, i.e., issues concerning Eretz Chico's decisions to use or not use covered countermeasures, including the use or non-use of PPE.  A substantial and disputed federal issue regarding the application of the PREP Act to Plaintiffs' claims therefore necessarily exists and must be resolved by this Court to ensure the uniform and appropriate application of the PREP Act.

41.     Courts have long recognized federal jurisdiction under the *Grable* doctrine.  *See, e.g.*, *McKay v. City & Cty. of San Francisco*, 2016 U.S. Dist. LEXIS 178436, *13-14 (N.D. Cal. Dec. 23,

2016) (finding federal jurisdiction under *Grable* where plaintiff's request that court enjoin use of flight paths was "tantamount" to a challenge to the validity of an FAA decision); *Bender v. Jordan*, 623 F.3d 1128, 1131 (D.C. Cir. 2010) (finding federal jurisdiction under *Grable* where breach of contract action arose under federal law because agreement was required by federal law and turned on interpretation of federal regulations).

42.     The two-step process is also satisfied where the alleged dispute "could have" supported the defendant's assertion of a federal declaratory judgment action. *See Hollyvale Rental Holdings, LLC v. Baum*, 2018 U.S. Dist. LEXIS 56435, at *9 [2018 WL 1608411, at *3] (D. Nev. Mar. 31, 2018) (*Grable* federal question jurisdiction existed under the "coercive action" doctrine where defendant "could have . . . brought a separate federal declaratory judgment action").

43.     The *Grable* doctrine and PREP Act are thus directly applicable to Plaintiffs' claims in any event and support this Court's jurisdiction.

## IV.    FEDERAL OFFICER JURISDICTION UNDER 28 U.S.C. § 1442(a)(1)

44.     This case is further removable under 28 U.S.C. § 1442(a)(1), which provides for removal when a defendant is sued for acts undertaken at the direction of a federal officer. "Unlike the general removal statute, the federal officer removal statute [Section 1442(a)] is to be 'broadly construed' in favor of a federal forum." *In re Commonwealth's Motion to Appoint Counsel against or Directed to Def. Ass'n of Philadelphia*, 790 F.3d 457, 466 (3d Cir. 2015). The case is removable pursuant to § 1442(a) because "(1) Defendants are 'persons' within the meaning of the statute; (2) the Plaintiff's claims are based upon Defendants' conduct 'acting under' the United States, its agencies, or its officers; (3) the Plaintiff's claims are 'for, or relating to' an act under color of federal office; and (4) Defendants raise a colorable federal defense to the Plaintiff's claims." *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 811 (3d Cir. 2016). All requirements for removal under § 1442(a)(1) are satisfied here.

45.     The "acting under" requirement, like the federal removal statute overall, is to be "liberally construe[d]" to cover actions that involve "an effort to assist, or to help carry out, the federal supervisor's duties or tasks." *Ruppel v. CBS Corp.*, 701 F.3d 1176, 1181 (7th Cir. 2012) (quoting *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 147 (2007)); *see In re Commonwealth*, 790 F.3d at

468. To satisfy the second requirement, "a private person's actions 'must involve an effort to assist, or to help carry out, the duties or tasks of the federal superior.'" *Watson*, 551 U.S. at 152. Federal courts "have explicitly rejected the notion that a defendant could only be 'acting under' a federal officer if the complained-of conduct was done at the specific behest of the federal officer or agency." *Papp,* 842 F.3d at 813. Instead, a specific instruction from a federal officer or a detailed regulation to compel specific conduct satisfies the second requirement. *See, e.g., Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d. 387, 398-99 (5th Cir. 1998) (the federal government's specifications for the composition of Agent Orange conferred federal officer jurisdiction on the independent contractor); *Jane Doe v. UMPM*, 2:20-cv-00359 (W.D. Pa. July 31, 2020) (hospital's creation and enhancement of website to encourage its use to further goals of DHHH's push for shareable electronic medical records conferred federal officer jurisdiction; whether federal law preempts state law and whether a private entity's conduct was outside the scope of its federal duties "is the very thing that should be left to a federal court to decide").

46. Here, Eretz Chico, in taking steps to prevent the spread of COVID-19, did so in compliance with CDC and CMS directives, which were aimed at helping achieve the federal government's efforts at stopping or limiting the spread of COVID-19. On March 10, 2020, CMS published a memorandum clarifying and amending policies and guidance in light of the CDC's expansion of the types of facemasks healthcare workers may use in situations involving COVID-19.[7] In doing so, CMS acknowledged the federal government was taking "critical steps" to prepare health care facilities to respond to COVID-19 and acknowledged the need to "explore flexibilities and innovative approaches within our regulations to allow health care entities to meet the critical health needs of the country." The memorandum issued on this date cites specifically to updated guidance from the CDC addressing the supply, allocation, and use of various items utilized to prevent the spread of infection and directly treat the virus.

47. Furthermore, Eretz Chico, in offering skilled nursing facilities and care, is subject to a high degree of federal regulation enacted to achieve the federal objective of allowing each resident in

---

[7] Centers for Medicare & Medicaid Services, Guidance for use of Certain Industrial Respirators by Health Care Personnel (March 10, 2020) (available at https://www.cms.gov/files/document/qso-20-17-all.pdf).

Defendant's Notice of Removal of Civil Action

long term care facilities to "attain and maintain [] highest practicable physical, mental, and psychosocial well-being." § 1396r; *see* § 1395i-3; 42 C.F.R § 483. Providers of services seeking to participate in the Medicare or Medicaid program, or both, must enter into an agreement with the HHS Secretary or the state Medicaid agency, as appropriate. Long term care facilities seeking to be Medicare and Medicaid providers of services must be certified as meeting federal participation requirements. 81 FR 68688. The federal government has a stated objective to provide for the care of nursing home residents and created a mandatory federal regulatory framework to convert the private entities such as Norwalk previously performing this service as federal officers or agents.

48. The present COVID-19 pandemic resulted in several new regulations directives, guidance and requirements issued as a result of the Federal government acting through the regulatory framework of CMS and the CDC to convert nursing homes into frontline responders to the national COVID crisis. Indeed, the CDC acknowledged that current knowledge of the nature of the virus was evolving, and that these efforts were part of an "ongoing US public health response to identify and contain this outbreak and prevent sustained spread of 2019-nCov in the United States."[8] CMS directed infection control efforts and clarified CDC guidance to preserve scarce medical resources, including PPE, and maximizing the capacity of the healthcare system to navigate the spread of the pandemic. Further, CMS ordered facilities to restrict visitors, cancel communal activities, screen staff, amend policies regarding interaction with vendors, and handle potential end-of-life interactions with family members, among other interventions.[9] On April 2, 2020, CMS issued new guidelines aimed specifically to long-term care facilities to mitigate the spread of COVID-19, with the stated purpose of 'critical, needed leadership" and issuing "immediate" actions to "keep patients and residents safe."[10]

---

[8] Centers for Disease Control and Prevention, Update and Interim Guidance on Outbreak of 2019 Novel Coronavirus (February 1, 2020) (available at https://emergency.cdc.gov/han/HAN00427.asp).
[9] Centers for Medicare & Medicaid Services, Guidance for Infection Control and Prevention of Coronavirus Disease 2019 (COVID-19) in Nursing Homes (Revised) (March 13, 2020) (available at https://www.cms.gov/files/document/qso/20-14-nh-revised.pdf).
[10] Centers for Medicare & Medicaid Services, COVID-19 Long-Term Care Facility Guidance (April 2, 2020) (available at https://www.cms.gov/files/document/4220-covid-19-long-term-care-facility-guidance.pdf).

Defendant's Notice of Removal of Civil Action

49.    Specifically, CMS directed long-term care facilities to "immediately" ensure compliance with "all CMC and CDC guidance related to infection control."  Again, CMS specifically referenced and referred facilities to updated and revised CDC guidelines.  CMS also implemented a number of actions to be undertaken immediately including 1) universal screening; 2) conservation of PPE; 3) proper PPE use; and 4) allocation of separate staffing, among other directives.  As has been previously stated, instructions were part of mandatory regulations imposed on long term care facilities by OBRA and regulations issued by CMS.  On April 19, 2020, CMS announced new regulatory requirements requiring nursing facilities to inform residents, families, and representatives of COVID-19 cases.[11]  Nursing homes were required to report COVID-19 cases and deaths directly to the CDC on an ongoing basis as the result of an unprecedented CMS regulatory requirement issued on May 1, 2020.  The Trump Administration implemented the new reporting requirement to develop a robust federal disease surveillance system to quickly identify problem areas and inform future infection control actions.  By law, CMS regulates and oversees nursing homes, which are certified to provide Medicare and/or Medicaid skilled nursing facility services.  This clearly demonstrates the fact that Eretz Chico was acting at the direction of the federal government and as its agent in responding to COVID-19 response.

50.    Eretz Chico, in following these directives, was engaged in an effort to assist, or to help carry out, the duties or tasks of CMS and the CDC in responding to the COVID-19 pandemic.  Eretz Chico's actions and conduct were taken due to unprecedented and "strong government intervention" which went beyond the "mere auspices of federal direction."  *Fung v. Abex Corp.*, 816 F. Supp. 569, 572 (N. D. Cal. 1992).  CMS was controlling and reimbursing Eretz Chico for actions taken in response to the COVID-19 pandemic and then-President Trump's proclamation declaring a national emergency concerning the novel COVID-19 outbreak on March 13, 2020.  Following the national emergency proclamation, rapid action was taken to waive restrictions and expand capacity for healthcare entities,

---

[11] Centers for Medicare & Medicaid Services, Press Release "Trump Administration Announces New Nursing Homes COVID-19 Transparency Effort" (April 19, 2020) (available at https://www.cms.gov/newsroom/press-releases/trumpadministration-announces-new-nursing-homes-covid-19-transparency-effort).

providers, and suppliers to coordinate a national response to the national emergency. The national response effort converted Eretz Chico into an agent of the United States.

51.    Finally, Eretz Chico satisfies the "nexus" or "causation" requirement for federal officer jurisdiction as the alleged conduct was undertaken "for or relating to" a federal office. To meet this requirement, "it is sufficient for there to be a connection or association between the act in question and the federal office." *In re Commonwealth*, 790 F.3d at 471. There is a clear causal nexus between the claims against Eretz Chico and the actions taken by Eretz Chico in responding to and administering care related to the COVID-19 outbreak. As described above, the Complaint alleges deficiencies in Eretz Chico's actions concerning infection control procedures taken in efforts to prevent the transmission and spread of COVID-19 while preserving resources to enable a nationwide response. The nexus element is thus met by the various orders, guidelines, and recommendations followed by Eretz Chico in addressing same.

52.    In addition, Eretz Chico meets the requirement of the existence of a colorable federal defense as it intends to assert that immunity under the PREP Act applies to the present action. For the purposes of removal, the defense must be "colorable" and need not be "clearly sustainable" as the purpose for the removal statute is to secure that the validity of the defense may be tried in federal court. *Willingham v. Morgan*, 395 U.S. 402, 407 (1969). The Supreme Court explained that "one of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court." *Acker*, 527 U.S. at 431. For this reason, "we have rejected a narrow, grudging" approach when analyzing whether a defendant had raised a colorable federal defense. *Id.* Based on the preemption argument alone, Eretz Chico has a colorable defense under the PREP Act, and this element is satisfied.

53.    Removal is thus proper under federal officer jurisdiction in addition to federal question jurisdiction under the complete preemption exception and the *Grable* doctrine.

**WHEREFORE**, having shown that this case is properly removable on the basis of federal question jurisdiction and federal officer jurisdiction, Eretz Chico provides notice pursuant to 28 U.S.C. § 1446 that the Action pending in Superior Court for the County of Los Angeles, California, case no. 21STCV44246, is removed to the United States District Court for the Central District of California, Western Division, and respectfully requests that this Court exercise jurisdiction over this case.

Respectfully submitted this sixth day of January, 2022.

**ZARMI LAW**

By: /s  *David Zarmi*
8950 W Olympic Blvd., #533
Beverly Hills, CA 90211
310-841-6455
davidzarmi@gmail.com
*Attorney for Defendant*
Eretz Chico Properties, LLC

**CERTIFICATE OF SERVICE**

I hereby certify that on this 24th day of February, 2022, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will then be sent Electronically to the

Defendant's Notice of Removal of Civil Action

registered participants as identified on the Notice of Electronic Filing and paper copies will be sent by first class mail to any counsel of record indicated as non-registered participants.

Dated: February 24, 2022

/s  David Zarmi
*Attorney for Defendant*
Eretz Chico Properties, LLC

*Attorney for Plaintiffs*:
Allen R. Oghassabian (SBN 292653)
Christian R. Oliver (SBN 313192)
THE BARNES FIRM, LC
655 W Broadway, Ste. 940
Telephone: 800-800-0000
Facsimile: 888-800-7050
allen.oghassabian@thebarnesfirm.com
christian.oliver@thebarnesfirm.com

Defendant's Notice of Removal of Civil Action

# EXHIBIT A

Defendant's Notice of Removal of Civil Action

**SUMMONS**
*(CITACION JUDICIAL)*

SUM-100

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
GLAD INVESTMENTS, INC. dba RIVERSIDE CONVALESCENT HOSPITAL, a California Skilled Nursing Facility; ERETZ CHICO PROPERTIES, LLC; THE GLADYS V. JENNINGS REVOCABLE TRUST, a Trust; and DOES 1-25, Inclusive, Defendants,
GARY SHUMLAI, an individual, Nominal Defendants

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
GRACE SHUMLAI, deceased, by and through her personal legal representative and successor in interest, TERRY LEWIS; and TERRY LEWIS, individually

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)
Superior Court of California
County of Butte

FILED

10/6/2021

Sharif Elmallah, Clerk
*a. Snow* Deputy
Electronically FILED

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.

Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.

Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.

| The name and address of the court is: *(El nombre y dirección de la corte es):* | CASE NUMBER: *(Número del Caso):* |
|---|---|
| North Butte County Courthouse 1775 Concord Avenue Chico, CA 95928 | 21CV02507 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is: *(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Christian R. Oliver, Esq. The Barnes Firm, LC, 655 W. Broadway, Ste.940, San Diego, CA 92101, (800)800-0000

DATE: *(Fecha)* 10/6/2021   Sharif Elmallah   Clerk, by *a. Snow* *(Secretario)*, Deputy *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☒ on behalf of *(specify):*  ERETZ CHICO PROPERTIES, LLC
   under: ☐ CCP 416.10 (corporation)   ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)   ☐ CCP 416.90 (authorized person)
   ☒ other *(specify):* LLC
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courts.ca.gov

For your protection and privacy, please press the Clear This Form button after you have printed the form.   Print this form   Save this form   Clear this form

**CM-020**

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| Christian R. Oliver, Esq. (SBN 313192)<br>THE BARNES FIRM, LC<br>655 West Broadway, Ste. 940<br>San Diego, CA 92101<br>TELEPHONE NO. 800-800-0000   FAX NO. (Optional): 888-800-7050<br>E-MAIL ADDRESS (Optional): christian.oliver@thebarnesfirm.com<br>ATTORNEY FOR (Name): Grace Shumlai, Deceased, et al | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** Butte
STREET ADDRESS: 1775 Concord Avenue
MAILING ADDRESS: 1775 Concord Avenue
CITY AND ZIP CODE: Chico, CA 95928
BRANCH NAME: North Butte County Courthouse

PLAINTIFF/PETITIONER: Grace Shumlai, Deceased, et. al.

DEFENDANT/RESPONDENT: Glad Investments, Inc. et. al.

| EX PARTE APPLICATION FOR EXTENSION OF TIME TO SERVE PLEADING AND ☑ ORDER EXTENDING TIME TO SERVE AND ☐ ORDER CONTINUING CASE MANAGEMENT CONFERENCE | CASE NUMBER:<br>21CV02507 |
|---|---|
| Note: This ex parte application will be considered without a personal appearance. (See Cal. Rules of Court, rule 3.1207(2).) | HEARING DATE<br>DEPT.         TIME: |

1. Applicant (name): Grace Shumlai, Deceased, et.al.
   is
   a. ☑ plaintiff
   b. ☐ cross-complainant
   c. ☐ petitioner
   d. ☐ defendant
   e. ☐ cross-defendant
   f. ☐ respondent
   g. ☐ other (describe):

2. The complaint or other initial pleading in this action was filed on (date): 10/6/2021

3. Applicant requests that the court grant an order extending time for service of the following pleading:
   a. ☑ Complaint
   b. ☐ Cross-complaint
   c. ☐ Petition
   d. ☐ Answer or other responsive pleading
   e. ☐ Other (describe):

4. Service and filing of the pleading listed in item 3 is presently required to be completed by (date): 12/5/2021

5. Previous applications, orders, or stipulations for an extension of time to serve and file in this action are:
   a. ☑ None
   b. ☐ The following (describe all, including the length of any previous extensions):

6. Applicant requests an extension of time to serve and file the pleading listed in item 3 on the following parties (name each):
   Glad Investments, Inc. dba Riverside Convalescent Hospital, Eretz Chico Properties and Gary Shumlai

| Form Approved for Optional Use<br>Judicial Council of California<br>CM-020 [Rev. January 1, 2008] | **EX PARTE APPLICATION FOR EXTENSION OF TIME<br>TO SERVE PLEADING AND ORDERS** | Page 1 of 2<br>Cal. Rules of Court,<br>rules 3.110, 3.1200–3.1207<br>www.courtinfo.ca.gov |
|---|---|---|

CM-020

| CASE NAME: | CASE NUMBER: |
|---|---|
| Grace Shumlai, deceased et. al. vs. Glad Investments et. al. | 21CV02507 |

7. The pleading has not yet been filed and served on the parties listed in item 6 for the following reasons *(describe the efforts that have been made to serve the pleading and why service has not been completed):*

Plaintiff retained First Legal to serve defendants through the Agent of Service but have been unable to attempt service.

☐ Continued on Attachment 7.

8. An extension of time to serve and file the pleading should be granted for the following reasons:

Plaintiff is in the process of obtaining Defendants location and will serve them within a reasonable amount of time

☐ Continued on Attachment 8.

9. If an extension of time is granted, filing and service on the parties listed in item 6 will be completed by *(date):*
January 31, 2022

10. Notice of this application under rules 3.1200–3.1207 ☐ has been provided as required *(describe all parties or counsel to whom notice was given; the date, time, and manner of giving notice; what the parties or counsel were told and their responses; and whether opposition is expected)* or ☑ is not required *(state reasons):*

California Rule of Court, rule 3.1207(2):

"An application for ex parte order must appear,either in person or by telephone under rule 3.670, except in the following cases....(2) Application for extensions of time to serve pleadings."

☐ Continued on Attachment 10.

11. Number of pages attached: _0_

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:  December 2, 2021

Christian R. Oliver
(TYPE OR PRINT NAME OF APPLICANT OR ATTORNEY FOR APPLICANT)

▶ _____
(SIGNATURE OF APPLICANT OR ATTORNEY FOR APPLICANT)

Order on Application is ☐ below ☐ on a separate document.

## ORDER

1. The application for an order extending time to serve and file the pleading is ☐ granted ☐ denied.

2. The pleading must be served and filed no later than *(date):*

3. ☐ The case management conference is rescheduled to:

   a. Date:

   b. Time:

   c. Place:

4. Other orders:

5. A copy of this application and order must be served on all parties or their counsel that have appeared in the case.

Date: _____

_____
JUDICIAL OFFICER

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name & Address)*: TELEPHONE NO: | FOR COURT USE ONLY |
|---|---|
| ATTORNEY FOR *(Name)*: | F **Superior Court of California** F |
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF BUTTE** | I County of Butte I |
| ☐ Butte County Courthouse ■ North Butte County Courthouse | L **10/06/2021** L |
| One Court Street, Oroville, CA 95965 1775 Concord Avenue, Chico, CA 95928 | E E |
| (530) 532-7002 (530) 532-7009 | D **Sharif Elmallah, Clerk** D |
| PLAINTIFF(S): GRACE SHUMLAI, DECEASED; TERRY LEWIS | By *a. Snow* Deputy |
| DEFENDANT (S): GARY SHUMLAI; GLAD INVESTMENTS, INC.; ERETZ CHICO PROPERTIES, LLC; THE GLADYS V. JENNINGS REVOCABLE TRUST | |
| **NOTICE OF ASSIGNMENT & CASE MANAGEMENT CONFERENCE** | CASE NUMBER: 21CV02507 |

1.   NOTICE is given of Assignment of the above entitled case for all purposes to Judge **Stephen E Benson**.

2.   NOTICE is given that the Case Management Conference is scheduled as follows:

Date: **March 30, 2022**        Time: **10:30 A.M.**        Court Facility: ■ CHICO (1775 CONCORD AVE, CHICO)

> **PLAINTIFF/CROSS COMPLAINANT MUST SERVE THIS NOTICE WITH SUMMONS AND COMPLAINT/CROSS COMPLAINT**

3.   You must file and serve a completed Case Management Statement at least fifteen days before the conference.

4.   You **must** be familiar with the case and be fully prepared to participate effectively in the Case Management Conference by personal or telephonic appearance.  (Telephonic appearances are arranged by calling Court Call at 1-888-882-6878).

5.   At the Case Management Conference, the court shall make pretrial orders, including but not limited to:

    a.   Establishing a discovery schedule.

    b.   Ordering the case to mediation or arbitration.

    c.   Dismissing fictitious defendants.

    d.   Scheduling exchange of expert witness information.

    e.   Setting subsequent conferences and the trial date.

    f.   Consolidating cases.

    g.   Severing trial of cross-complaints or bifurcating trial of issues.

    h.   Determining when demurrers, motions to strike and other motions are to be noticed.

**\* \* \* N o t e :   C o u n s e l   a n d   P a r t i e s   S h o u l d   R e v i e w   C R C   §3.720-3.730. \* \* \***

**Tentative Rulings:**  Although not applicable to Case Management Conferences, the Court advises counsel that for law and motion matters, the Court follows the tentative ruling procedure set forth in CRC § 3.1308(a)(1) and in Local Rule 2.9: tentative rulings on law and motion matters will be available on the Court's website at www.buttecourt.ca.gov and by telephone at (530) 532-7022 by 3:00 p.m on the Court day preceding the hearing. By 4 p.m. that same day, a party must notify all other parties and the Court of their intention to argue. If timely notice is not given, no oral argument will be permitted unless the court has directed the parties to provide further argument in its tentative ruling.

> **\* \* S a n c t i o n s \* \***
>
> If you do not, (1) file the Case Management Statement, (2) attend the Case Management Conference personally or by telephone (or have counsel attend for you), and/or (3) you (or counsel appearing for you) do not participate effectively in the conference, the court may impose sanctions (including dismissal of the case and payment of money).

I declare under penalty of perjury that I am not a party to this action, am at least 18 years of age and that I personally Mailed a copy of this Notice of Assignment & Case Management Conference with the conference date and hearing time inserted to Christian R Oliver, a person representing the plaintiff/cross-complainant.

Date: October 06, 2021                      Sharif Elmallah, Clerk of the Court, by Ashley Snow, Deputy.



**Superior Court of California**
**County of Butte**

1775 Concord Ave
Chico CA  95928

Civil
530-532-7009

Christian R Oliver
655 West Broadway Suite 940
San Diego CA  92101

F
I
L
E
D

Superior Court of California
County of Butte

OCT 0 6 2021

Sharif Elmallah, Clerk
By____Snow____Deputy

F
I
L
E
D

Re: Shumlai, deceased, Grace et al  vs. Shumlai, Gary et al

Case Number: 21CV02507

### Proof of Mailing

I, Sharif Elmallah, Clerk of the Superior Court of the State of California, in and for the County of Butte, do hereby certify that on October 06, 2021, I served copies of Notice of Assignment and Case Management Conference, in the above entitled action by placing the document(s) for collection and mailing on the date shown, following standard court practices in a sealed envelope with postage fully prepaid, to the parties shown below.  The mailing occurred in Chico, California.

Mailed to:
Christian R Oliver  655 West Broadway, Suite 940  San Diego, CA  92101

October 06, 2021

Sharif Elmallah,
Clerk of the Superior Court
By: A. Snow, Deputy Clerk

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| ALLEN R. OGHASSABIAN, SBN 292853<br>CHRISTIAN R OLIVER, SBN 313192<br>THE BARNES FIRM, LC<br>655 W. BROADWAY, SUITE 940, SAN DIEGO, CA 92101 | |

TELEPHONE NO. (800)800-0000     FAX NO. *(Optional)*

ATTORNEY FOR *(Name):* GRACE SHUMLAI, deceased, by and through her personal legal representative and successor in interest, TERRY LEWIS; and TERRY LEWIS, individually

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** BUTTE

STREET ADDRESS: 1775 Concord Avenue

MAILING ADDRESS:

CITY AND ZIP CODE: Chico, CA 95928

BRANCH NAME: North Butte County Courthouse

CASE NAME: GRACE SHUMLAI, deceased, et al. vs. GLAD INVESTMENTS, INC., et al.

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: |
|---|---|---|---|---|
| [X] Unlimited<br>(Amount demanded exceeds $25,000) | [ ] Limited<br>(Amount demanded is $25,000) | [ ] Counter    [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | | JUDGE:<br><br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

**1. Check one box below for the case type that best describes this case:**

**Auto Tort**
- [ ] Auto (22)
- [ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- [ ] Asbestos (04)
- [ ] Product liability (24)
- [ ] Medical malpractice (45)
- [X] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- [ ] Business tort/unfair business practice (07)
- [ ] Civil rights (08)
- [ ] Defamation (13)
- [ ] Fraud (16)
- [ ] Intellectual property (19)
- [ ] Professional negligence (25)
- [ ] Other non-PI/PD/WD tort (35)

**Employment**
- [ ] Wrongful termination (36)
- [ ] Other employment (15)

**Contract**
- [ ] Breach of contract/warranty (06)
- [ ] Rule 3.740 collections (09)
- [ ] Other collections (09)
- [ ] Insurance coverage (18)
- [ ] Other contract (37)

**Real Property**
- [ ] Eminent domain/inverse condemnation (14)
- [ ] Wrongful eviction (33)
- [ ] Other real property (26)

**Unlawful Detainer**
- [ ] Commercial (31)
- [ ] Residential (32)
- [ ] Drugs (38)

**Judicial Review**
- [ ] Asset forfeiture (05)
- [ ] Petition re: arbitration award (11)
- [ ] Writ of mandate (02)
- [ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
- [ ] Antitrust/Trade regulation (03)
- [ ] Construction defect (10)
- [ ] Mass tort (40)
- [ ] Securities litigation (28)
- [ ] Environmental/Toxic tort (30)
- [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- [ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- [ ] RICO (27)
- [ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
- [ ] Partnership and corporate governance (21)
- [ ] Other petition *(not specified above)* (43)

**2.** This case [ ] is [X] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:

- a. [ ] Large number of separately represented parties
- b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
- c. [ ] Substantial amount of documentary evidence
- d. [ ] Large number of witnesses
- e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
- f. [ ] Substantial postjudgment judicial supervision

**3.** Remedies sought *(check all that apply):* a. [X] monetary   b. [ ] nonmonetary; declaratory or injunctive relief   c. [ ] punitive

**4.** Number of causes of action *(specify):* Four

**5.** This case [ ] is [X] is not a class action suit.

**6.** If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: October 6, 2021

Christian R. Oliver, Esq.

_____       ▶ _____
(TYPE OR PRINT NAME)                               (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

CM-010

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check one box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
  Medical Malpractice– Physicians & Surgeons
  Other Professional Health Care Malpractice
Other PI/PD/WD (23)
  Premises Liability (e.g., slip and fall)
  Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  Intentional Infliction of Emotional Distress
  Negligent Infliction of Emotional Distress
  Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
  Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
  Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
  Negligent Breach of Contract/ Warranty
  Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
  Collection Case–Seller Plaintiff
  Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
  Auto Subrogation
  Other Coverage
Other Contract (37)
  Contractual Fraud
  Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court Case Matter
  Writ–Other Limited Court Case Review
Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
  Abstract of Judgment (Out of County)
  Confession of Judgment *(non-domestic relations)*
  Sister State Judgment
  Administrative Agency Award *(not unpaid taxes)*
  Petition/Certification of Entry of Judgment on Unpaid Taxes
  Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
  Declaratory Relief Only
  Injunctive Relief Only *(non-harassment)*
  Mechanics Lien
  Other Commercial Complaint Case *(non-tort/non-complex)*
  Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief From Late Claim
  Other Civil Petition

---

CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Page 2 of 2

For your protection and privacy, please press the Clear

1  ALLEN R. OGHASSABIAN, SBN 292653
   CHRISTIAN R. OLIVER, SBN 313192
2  **THE BARNES FIRM, LC**
   655 W. Broadway, Ste 940
3  San Diego, California 92101
   Tel: 800.800.0000  Fax: 888.800-7050
4  Email: allen.oghassabian@thebarnesfirm.com
   Email: christian.oliver@thebarnesfirm.com
5

6  Attorneys for Plaintiffs

F I L E D
Superior Court of California
County of Butte

10/6/2021

Sharif Elmallah, Clerk
By _a. Snow_ Deputy
Electronically FILED

7            **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

8                      **COUNTY OF BUTTE**

9  GRACE SHUMLAI, deceased, by and through her   |  Case No.: 21CV02507
   personal legal representative and successor in
10 interest, TERRY LEWIS; and TERRY LEWIS,         |  **COMPLAINT FOR DAMAGES:**
   individually,
11                                                 |  1. **Elder Abuse and Neglect**
12         Plaintiffs,                             |     **(Welf. & Inst. Code, §15600,**
   v.                                              |     **et seq.)**
13                                                 |  2. **Violation of Patient Rights**
14 GLAD  INVESTMENTS,  INC.  dba  RIVERSIDE        |     **(Health & Safety Code §1430(b))**
   CONVALESCENT HOSPITAL, a California Skilled     |  3. **Negligence**
15 Nursing Facility; ERETZ CHICO PROPERTIES, LLC,  |
   THE GLADYS V. JENNINGS REVOCABLE TRUST,         |  4. **Wrongful Death**
16 a Trust; and DOES 1-25, inclusive,             |

17         Defendants,

18 -and-

19 GARY SHUMLAI, an individual,

20 Nominal Defendants

21

22     All allegations set forth in this Complaint are based on information and belief except

23 those allegations which pertain to Plaintiff(s) herein and their counsel.  Each allegation in

24 this Complaint either has evidentiary support or is likely to have evidentiary support after

25 reasonable opportunity for further investigation and discovery.

26 ///

27                                    1

28                               **COMPLAINT**

**THE PARTIES**

1.     Plaintiff Decedent GRACE SHUMLAI ("Decedent GRACE") was born on February 2, 1940 and died on October 6, 2020.

2.     Decedent GRACE was a victim of elder abuse and at all times relevant herein, an "elder" or "dependent adult" as defined by Welfare & Institutions Code § 15610.23(b), and had physical limitations restricting her ability to carry out normal activities and protect her rights as discussed more fully *infra*.

3.     At all times relevant to this action herein, Decedent GRACE was a resident of the State of California and County of Butte.

4.     Plaintiff TERRY LEWIS ("TERRY") is an adult individual, the natural son of Decedent GRACE, and she brings the survival claims of Elder Abuse and Neglect and Violation of Patient Rights on behalf of Decedent GRACE, in his capacity as her personal legal representative and Successor in Interest.

5.     TERRY is the surviving child of Decedent GRACE. He brings the Wrongful Death action in his individual capacity as Decedent GRACE's heir.

6.     At all times relevant to this action herein, TERRY was a resident of the State of California and County of Butte.

7.     At all times relevant to this action herein, the Skilled Nursing Facility ("SNF") known as the RIVERSIDE CONVALESCENT HOSPITAL ("Defendant FACILITY") was located at 375 Cohasset Avenue, Chico, CA 95926.

8.     Plaintiffs are informed and believe, and based upon information and belief allege, that Defendant GLAD INVESTMENTS, INC. ERETZ CHICO PROPERTIES, LLC, and Defendant THE GLADYS V. JENNINGS REVOCABLE TRUST were doing business as ("dba") Defendant FACILITY.

9.     Plaintiffs are informed and believe, and based upon information and belief allege, that at all times relevant herein, Defendant GLAD INVESTMENTS, INC., ERETZ

2

**COMPLAINT**

1 | CHICO PROPERTIES, LLC and Defendant THE GLADYS V. JENNINGS REVOCABLE
2 | TRUST owned the Defendant FACILITY.

3 |       10.     Plaintiffs are informed and believe, and based upon information and belief
4 | allege, that at all times relevant herein, Defendants operated the Defendant FACILITY.

5 |       11.     Plaintiffs are informed and believe, and based upon information and belief
6 | allege, that at all times relevant herein, Defendant GLAD INVESTMENTS, INC. (hereinafter
7 | "GLAD (THE LICENSEE)") was the Licensee for the Defendant FACILITY.

8 |       12.     Plaintiffs are informed and believe, and based upon information and belief
9 | allege, that at all times relevant herein, Defendant ERETZ CHICO PROPERTIES, LLC
10 | (hereinafter "ERETZ (THE LICENSEE)") was the Licensee for the Defendant FACILITY.

11 |       13.     Plaintiffs are informed and believe, and based upon information and belief
12 | allege, that Defendant GLAD (THE LICENSEE), was at all times relevant herein, a
13 | California registered corporation.

14 |       14.     Plaintiffs are informed and believe, and based upon information and belief
15 | allege, that Defendant ERETZ (THE LICENSEE), was at all times relevant herein, a
16 | California registered limited liability company.

17 |       15.     Plaintiffs are informed and believe, and based upon information and belief
18 | allege, that THE GLADYS V. JENNINGS REVOCABLE TRUST was at all times relevant
19 | herein, a California registered trust.

20 |       16.     Plaintiffs are informed and believe, and based upon information and belief
21 | allege, that Defendant GLAD (THE LICENSEE)'s principal executive office is located at
22 | 375 Cohasset Rd. Chico, CA 95926.

23 |       17.     Plaintiffs are informed and believe, and based upon information and belief
24 | allege, that Defendant ERETZ (THE LICENSEE)'s principal executive office is located at
25 | 7223 Beverly Blvd., Suite 205 Los Angeles, CA 90036.

26 |       18.     The Nominal Defendant, GARY SHUMLAI, is Decedent GRACE's heir who,

27 |

28 |

3

**COMPLAINT**

upon information and belief, have declined participating in the instant action and are named herein for service purposes only.

19.     On September 30, 2021, Plaintiffs served a Notice of Intent to Commence Action Against Health Care Provider pursuant to Code of Civil Procedure section 364 on Defendants.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over the causes of action asserted pursuant to California Code of Civil Procedure § 410.10.

21.     The acts alleged in this complaint occurred in the County of Butte.

22.     The Defendants, and each of them, have sufficient minimum contacts in California based on conducting business in California or otherwise intentionally avail themselves of the California market though their provision of services in the County of Butte, so as to render them essentially at home in California and making the exercise of jurisdiction by the California courts consistent with traditional notions of fair play and substantial justice.

23.     Venue is proper in this Court pursuant to California Code of Civil Procedure §§ 395 and 395.5 based on the facts, without limitation, that this Court is a court of competent jurisdiction, that at least one Defendant either resides or does business in the County of Butte, and because the injuries to the persons complained of herein occurred in the County of Butte.

## BACKGROUND ALLEGATIONS

24.     Plaintiffs are informed and believe, and based upon information and belief allege, that a licensee is responsible for compliance with licensing requirements and the organization, management, operation, and control of the facility. The general duties of a licensee are set forth in Title 22 of the California Code of Regulations, § 72501. Certain duties are non-delegable including the responsibility for compliance with regulations and

4

COMPLAINT

the management and control of the SNF. Delegation of authority by a licensee shall not diminish the responsibilities of the licensee. Therefore, even where a licensee delegates operational control to another person or entity, that licensee remains directly liable for management, operation, and control of the facility. (Cal. Code Regs., tit. 22, § 72501(a).)

25.   Plaintiffs are informed and believe, and based upon information and belief allege, that Defendants dba the Defendant FACILITY were subject to the requirements of federal and state laws and regulations that govern the operation of a SNF in California. In connection with its operation of the Defendant FACILITY, Defendants had a substantial and ongoing caretaking and custodial relationship involving ongoing responsibility for the basic needs of its residents, including Decedent GRACE.

26.   Plaintiffs are informed and believe, and based upon information and belief allege, by law, Defendant GLAD (THE LICENSEE) and Defendant ERETZ (THE LICENSEE) of SNFs operating in California must delegate to a designated administrator, in writing, the authority to organize and carry out the day-to-day functions of the SNF. During Decedent GRACE's admission to the Defendant FACILITY, the Defendant FACILITY had an Administrator, believed to be Tina Brey, who was responsible for the administration and management of the SNF in accordance with Title 22 of the California Code of Regulations § 72513. The Administrator was a managing agent of Defendant GLAD (THE LICENSEE) or Defendant ERETZ (THE LICENSEE) and had care or custody of Decedent GRACE.

27.   Plaintiffs are informed and believe, and based upon information and belief allege, Defendants, and each of them, had the duty to employ an adequate number of qualified personnel to carry out all of the functions of the SNF. (Health & Safety Code § 1599.1(a); Cal. Code Regs., tit. 22, § 72501, subd. (e)) Adequate staffing is essential to proper patient care and outcomes. There is no greater predictor of patient outcome in a skilled nursing facility than understaffing. The standard of care codified at 42 U.S.C. §§

482.30 and 483.25 is to provide sufficient qualified nursing staff for nursing and related services to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident, as determined by resident assessments, and plans of care. Because these requirements are codified in state and federal regulations, everyone involved in nursing home operations, including the owners, operators, managers, administrators, and directors of nursing in this case, understands the direct relationship between quality staff and patient outcomes.

28.    Plaintiffs are informed and believe, and based upon information and belief allege, in addition to Defendants' duty to have sufficient numbers of well-qualified and trained staff, Defendants had a duty to ensure that the Defendant FACILITY was operated in a way that respected and did not violate well-recognized resident rights under California Code of Regulations, title 22; Health and Safety Code § 1599.1; 42 U.S.C. §§ 1395-1396; and 42 Code of Federal Regulations part 483.

29.    Plaintiffs are informed and believe, and based upon information and belief allege, the Defendant FACILITY and THE GLADYS V. JENNINGS REVOCABLE TRUST were under common ownership and control.

30.    Plaintiffs are informed and believe, and based upon information and belief allege, Defendant GLAD (THE LICENSEE), Defendant ERETZ (THE LICENSEE) and Defendant THE GLADYS V. JENNINGS REVOCABLE TRUST were responsible for ensuring the Defendant FACILITY was operated in full compliance with federal and state laws and regulations governing operations of a SNF, and for all aspects of the organization, management, operation, and control of the Defendant FACILITY.

31.    Plaintiffs are informed and believe, and based upon information and belief allege, Decedent GRACE's injuries arose out of the organization, management, operation and control of the Defendant FACILITY by Defendant GLAD (THE LICENSEE), Defendant ERETZ (THE LICENSEE) and Defendant THE GLADYS V. JENNINGS REVOCABLE

6

**COMPLAINT**

1  TRUST in their capacity as owner/operator of the Defendant FACILITY.

2      32.    Plaintiffs are informed and believe, and based upon information and belief
3  allege, Defendants, each of them, share a joint responsibility for Decedent GRACE's
4  injuries and death.

5      33.    Plaintiffs are informed and believe, and based upon information and belief
6  allege, that at all times relevant herein, Defendants managed and controlled the Defendant
7  FACILITY and made critical decisions regarding staffing budget and census, resulting in
8  nurse staffing which fell below the legal minimum.  Defendant GLAD (THE LICENSEE),
9  Defendant ERETZ (THE LICENSEE) and Defendant THE GLADYS V. JENNINGS
10 REVOCABLE TRUST benefited financially from the policies and procedures, decisions,
11 control, and management of the Defendant FACILITY in the form of income and profits
12 received from the Defendant FACILITY.

13     34.    Plaintiffs are informed and believe, and based upon information and belief
14 allege, that if Defendant GLAD (THE LICENSEE), Defendant ERETZ (THE LICENSEE),
15 Defendant THE GLADYS V. JENNINGS REVOCABLE TRUST, and Defendant FACILITY
16 are not treated as a single enterprise or alter-egos of each other, a severe injustice will
17 result. Allowing Defendant GLAD (THE LICENSEE), Defendant ERETZ (THE LICENSEE)
18 and Defendant THE GLADYS V. JENNINGS REVOCABLE TRUST to avoid legal
19 responsibility for actions taken at the Defendant FACILITY level, which they directed and
20 caused, would be unfair and unjust.

21     35.    Plaintiffs are informed and believe, and based upon information and belief
22 allege, Defendants engaged in elder abuse and other wrongful conduct against Decedent
23 GRACE.

24     36.    The true names and capacities, whether individual, corporate partnership,
25 associate, or otherwise of Defendants named herein as DOES 1-25, inclusive, are
26 unknown to Plaintiff, who therefore sue those Defendants by such fictitious names. Plaintiff

27

28

**COMPLAINT**

will seek leave to amend this complaint to allege the true names and/or capacities and/or involvement of said fictitiously named Defendants when ascertained. Plaintiff is informed and believes, and thereon alleges, that each of the Defendants designated as a DOE is responsible in some manner for the events and happenings herein referred to and thereby legally caused the injuries and damages herein alleged.

37.    On information and belief, DOES 1 through 10 at all times mentioned herein owned, operated, managed, supervised, controlled, maintained, or were otherwise responsible for the business activities of Defendant FACILITY. Such DOES would include officers, directors, controlling shareholders, partners, and/or governing board members, persons in *de facto* control of healthcare, operators, and/or employees of Defendant FACILITY.  At all times relevant to this action, DOES 1 through 10 helped set and enforce policies and procedures for the services rendered to clients of Defendant FACILITY.

38.    On information and belief, DOES 11 through 15 may be staff or contracted personnel of Defendant FACILITY, including physicians, licensed nurses, aides, social workers, business office personnel, and/or other clinical, or administrative personnel including, without limitation, persons directly or indirectly responsible for provision of patient care, persons having made representations or warranties to Plaintiffs, and/or persons acting in concert with other Defendants.

39.    On information and belief, DOES 16 through 25 include persons directly or indirectly responsible for provision of care to Decedent GRACE, including but not limited to physicians, medical groups, managed care organizations, acute care hospitals, home health agencies, visiting nurses, therapists, and/or other ancillary care providers who saw, examined, evaluated, observed and/or treated or failed to treat Decedent GRACE  leading to injury or death and/or persons having made representations or warranties to or from the Department of Social Services, the Department of Public Health, the Long Term Care Ombudsman, Adult Protective Services, Defendant FACILITY, and/or anyone purporting

**COMPLAINT**

to act on behalf of or in concert with these persons or entities. The identities of such persons or entities are unknown to Plaintiff and Plaintiff will seek leave to amend when those identities are ascertained. Plaintiff is informed and believes, and thereon alleges, that each of the Defendants designated as a DOE is responsible in some manner for the events and happenings herein referred to and thereby legally caused the injuries and damages herein alleged.

40.    Upon information and belief, Plaintiff further alleges that each Defendant and DOES 1-25 were the agent, servant, employee, joint venturer, and/or partner of each Co-Defendant, and at all times acted within the course and scope of said agency, employment, venture, and/or partnership pursuant to the policies, practices, procedures, written or otherwise, and with the advance knowledge, acquiescence, or subsequent ratification of each Co-Defendant.

41.    Upon information and belief, Plaintiff further alleges that each Defendant and DOES 1-25 are liable for the acts of each other through principals and/or respondent superior, agency, ostensible agency, partnership, alter-ego and/or other form(s) of vicarious liability. Consequently, each Defendant is jointly and severally liable to Plaintiffs for damages sustained as a proximate result of his, her, or their conduct.

42.    Decedent GRACE was admitted to Defendant FACILITY as she required skilled and custodial services to meet her care needs.

43.    Decedent GRACE had a history of aphasia, cognitive deficits, diabetes, dysphasia, osteoarthritis, and hypertension. She also required assistance with ambulation and transfers. As a result of her physical and mental condition, she was dependent on others for her activities of daily living including, but not limited to, personal hygiene, continence care, transferring in and out of bed, eating, drinking, and managing her medication.

44.    Defendants failed to properly assess and gather information to make

9

**COMPLAINT**

decisions about suitable interventions to avoid individualized health risks. The care plan must set goals to provide benchmarks for evaluating whether the planned care interventions are effective. The staff must assess and reassess the resident to determine whether the care plan goals are being met.  If the interventions are not working, the care plan must be modified to include alternative treatment interventions.  If the resident has a change of condition, he or she must be reassessed to determine if the care plan needs to be modified as a result of the resident's new condition and/or baseline. Care planning is an ongoing interdisciplinary process that is critical to patient outcomes.

45.   Decedent GRACE's health caused her to be especially susceptible to viral communicable diseases.

46.   Defendants knew, or should have known, that prevention and care is especially important among nursing home residents such as Decedent GRACE, who are more susceptible to respiratory infection/syndrome due to their age and medical conditions.

47.   However, Defendant FACILITY failed to provide adequate care to Decedent GRACE and failed to effectively develop, implement, and modify care plans for her individualized care needs.

48.   Decedent GRACE required full assistance with eating and drinking. Yet the records documented by RIVERSIDE CONVALESCENT HOSPITAL reflect that Defendants failed to provide the full assistance she required.

49.   During Decedent GRACE's stay at Defendant FACILITY, her son, TERRY, checked on his mother regularly.

50.   Sometime during the early spring of 2020, Defendant FACILITY no longer allowed visitors in the facility.

51.   On October 3, 2020, Decedent GRACE tested positive for COVID-19.

52.   Decedent GRACE's health continued to decline. She was diagnosed with ventricular tachycardia, cardiogenic shock, and bacterial pneumonia.

**COMPLAINT**

53.   Unsurprisingly, Decedent GRACE's health continued to deteriorate. Decedent GRACE could not recover from her extreme respiratory infection/syndrome and other injuries and died on October 6, 2020.

## FIRST CAUSE OF ACTION

## ELDER ABUSE AND NEGLECT

### [Welfare & Institution Code §§ 15600, et seq.]

**(Against Defendants GLAD INVESTMENTS, INC. dba RIVERSIDE CONVALESCENT HOSPITAL, THE GLADYS V. JENNINGS REVOCABLE TRUST, and DOES 1-25)**

54.   Plaintiffs hereby incorporates by reference Paragraph 1 through 53 of this Complaint as though fully set forth herein.

55.   Decedent GRACE, at all times relevant herein, was over the age of 65 and thus an "elder" as that term is defined in Welfare and Institutions Code § 15610.27.

56.   Decedent GRACE was not able-bodied and was unable to take care of her own needs during the time she was under the care and custody of Defendants, while a resident of Defendant FACILITY. Decedent GRACE had a history of aphasia, cognitive deficits, diabetes, dysphasia, osteoarthritis, and hypertension. She was, thus, dependent on Defendants' care staff for all her activities of daily living including assistance in dressing, grooming, bathing, toileting, medication management, and feeding.

57.   Accordingly, Defendants and each of them, had a substantial ongoing caretaking and custodial relationship with Decedent GRACE, while she was a resident at the Defendants' FACILITY. Decedent GRACE was dependent on Defendants, and each of them, for all of her custodial and other care needs.

58.   Each resident of Defendants' FACILITY is an elder and/or dependent adult as defined by Welfare & Institutions Code §§ 15610.23 and 15610.27, respectively. Defendants knew or should have known that their conduct, as described herein, was directed to one or more elder and/or dependent adults. Because of her age, condition,

**COMPLAINT**

restricted mobility, and disability, Decedent GRACE was substantially more vulnerable to the conduct of Defendants than other members of the public.

59.    Defendants had a duty to Decedent GRACE to provide access to care and treatment to prevent the development of wounds, infection/syndrome, pain, malnutrition, and dehydration; to ensure medical care that was needed was actually provided; and to accept and retain only those residents for whom it could provide adequate care, supervision, and assistance. Because Defendant FACILITY accepted and retained Decedent GRACE as a resident, they owed a duty to Decedent GRACE to act reasonably in the discharge of their duties and to not willfully or recklessly ignore Decedent GRACE's medical care needs or cause unnecessary suffering. Without limiting the foregoing, Defendants owed the following duties to Decedent GRACE:

        a.    Duty to identify individualized care needs based on assessment of patient's needs with input from patient and, if necessary, health professionals involved in the care of the patient (Cal. Code Regs., tit. 22, § 72311(a)(1)(A)); 42 C.F.R. §§ 483.10(f), 483.20(b)(1); 42 U.S.C. § 1395i-3(b)(3));

        b.    Duty to provide care as implemented by individualized written patient care plan indicating the care to be given, objectives to be accomplished, and the professional discipline responsible for each element of care (Cal. Code Regs., tit. 22, § 72311(a)(1)(B); 42 C.F.R. § 483.10(c));

        c.    Duty to review, evaluate, and update patient care plans as necessary and more often if there is a change of the patient's condition (Cal. Code Regs., tit. 22, § 72311(a)(1)(C));

        d.    Duty to provide care as implemented by the patient care plan according to the methods indicated (Cal. Code Regs., tit. 22, §

12

**COMPLAINT**

72311(a)(2); 42 U.S.C. § 1395i-3(b)(4));

e. Duty to provide care pursuant to physician's orders in the administration of medication and/or treatment, to provide medication and treatment as prescribed, and prepare a record of the administration of medication and treatment (Cal. Code 17 of Regs., tit. 22, §§ 72313 (a)(1)-(2) and (c));

f. Duty to record nurses' notes that are clear and legible, dated and signed, among other qualifications, including narratives or how a patient responds, eats, drinks, looks, feels, and reacts (Cal. Code Regs., tit. 22, § 72547(a)(5));

g. Duty to provide the resident or responsible party with the opportunity to participate in an immediate and ongoing basis in the total plan of care including identification of medical, nursing, and psychosocial needs and the planning of related services (Cal. Code Regs., tit. 22, § 72527(a)(3); 42 C.F.R. § 483.10(c));

h. Duty to provide care in such a manner and in such an environment by facility staff to be free from mental and physical abuse and neglect (Cal. Code Regs., tit. 22, § 72527(a)(10); 42 C.F.R. § 483.12);

i. Duty to provide care in such a manner and in such an environment to prevent formation and progression of pressure ulcers including turning and repositioning; using pressure-reducing devices where indicated; provide care to maintain clean, dry skin free of feces and urine; and carry out physician orders for treatment of ulcers (Cal. Code Regs., tit. 22, § 72315(f); Health & Saf. Code, § 1599.1(b));

j. Duty to provide adequate personal hygiene, nutrition, and fluids to prevent malnutrition, dehydration, and promote wound healing (Cal.

13

1  Code of Regs., tit. 22, §§ 72315(d)(g)(h); Health & Saf. Code, §
2  1599.1(b));

3      k.  Duty to provide adequate number of qualified personnel to carry out
4  all functions of the facility and to meet patients' needs as well as
5  adequate training and competent supervision (Cal. Code of Regs., tit.
6  22, §§ 72329 and 72329.1; Health & Saf. Code, § 1599.1(a); 42 C.F.R.
7  §§ 483.35, 483.95).

8      l.  Duty to treat residents with consideration, respect, and full recognition
9  of dignity (Cal. Code Regs., tit. 22, § 72527(a)(12)); and,

10      m.  Duty to notify physician of any change of condition and to note all
11  attempts to notify physician in patient's health record (Cal. Code
12  Regs., tit. 22, § 72311(a)(3) and (b)).

13      60.  In addition, and without limiting the generality of the foregoing, Defendants
14  owed the following duties to Decedent GRACE and committed elder neglect by: failing to
15  implement policies and procedures to ensure resident care needs are met; failing to provide
16  training on the policies and procedures to ensure resident care needs are met; failing to
17  ensure physician care is provided; failing to plan a budget whereby staffing levels are
18  adequate; failing to allocate sufficient resources to staff Defendant FACILITY in both
19  quantity and quality caregivers; and failing to comply with state and federal laws and
20  regulations pertaining to SNFs.

21      61.  Defendants conduct further constitutes neglect as that term is defined in
22  Welfare and Institutions Code § 15610.57 to include "the negligent failure of any person
23  having the care or custody of an elder or a dependent adult to exercise that degree of care
24  that a reasonable person in a like position would exercise, including but not limited to:

25      a. Failure to assist in personal hygiene, or in the provision of food, clothing,
26  or shelter.

27

28

**COMPLAINT**

b. Failure to provide medical care for physical and mental health needs;

c. Failure to protect from health and safety hazards;

d. Failure to prevent malnutrition or dehydration.

62.     Pursuant to California law, Defendants are required to provide an elder, such as Decedent GRACE, "basic services" including, a duty to continually assess Decedent GRACE's condition, a duty to note changes in Decedent GRACE's condition, and a duty to immediately notify Decedent GRACE's physician and family of changes.  Defendants similarly had a duty to create and update adequate plans of care, and to receive, note, and follow physicians' orders. Defendants had a duty to treat Decedent GRACE with dignity and respect, and to provide adequate numbers of nursing and other similar staff to assist her. Defendants had a duty to employ adequately trained staff. Yet Defendants failed to provide medical care and custodial care sufficient to meet Decedent GRACE's physical and mental health needs and failed to protect her from health and safety hazards, as described in detail herein.

63.     Defendants, knew that Decedent GRACE was an elder who required assistance to meet her basic needs, yet failed to provide for those needs, even with knowledge of Decedent GRACE's high risk for injury, her dependence on Defendants, and the substantial certainty that Decedent GRACE would be injured if these needs were not provided for. Defendants' failure to provide Decedent GRACE with the care, assistance, and monitoring that he required caused her harm.

64.     Defendants denied and withheld basic care to Decedent GRACE despite the knowledge that by doing so, injury was substantially certain to befall her or with conscious disregard of the high probability of such injury. Defendants' denial and withholding of basic care to Decedent GRACE caused her injuries, needless suffering, and emotional distress. Furthermore, Defendants withheld medical care by failing to assess and reassess Decedent GRACE's condition, update individualized care plan(s), and monitor her condition to see

15

**COMPLAINT**

proprietary interests, which it placed above that of Decedent GRACE, and other residents/patients.

67.     Defendants had a duty to employ adequate numbers of sufficiently staffed employees to provide minimum services and oversight of residents, policies and procedures to ensure that basic services and oversight are implemented to assure the health and safety of residents, employment and training of staff such that staff is experienced and competent to perform the job duties necessary to assure safety and oversight of residents, accepting, training, and employing staff in a manner that avoids "a revolving door" of crucial managerial employees such that there is little or no continuity and/or an absence of crucial managerial employees at critical times, such as the initial admission of a resident to the FACILITY.

68.     Defendants knew or should have known that by understaffing their facilities, in quantity and quality, they were putting Defendant FACILITY residents, including Decedent GRACE, at risk for known, harmful, life threatening conditions, including dehydration and death. This is because Defendants, and each of them, including the owners, operators, administrators, and directors of nursing understand the direct relationship between staffing and patient outcomes. The higher the staffing ratio, the better the patient outcome.

69.     Defendants, and each of them, knew or should have known that Defendant FACILITY's operation was designed and operated in a manner to circumvent its legal duty to comply with applicable statutes and regulations to maximize profitability. That knowledge was exclusively in the possession of the Defendants. Decedent GRACE and her family had no such knowledge, nor the opportunity to obtain such knowledge and information. Decedent GRACE and her family believed that Defendants' business operations were, as represented by the Defendants, properly run in compliance with the law and that the care afforded to its residents was within all State guidelines. They understood that the management and staff at Defendant FACILITY were "experts" and were readily familiar,

17

**COMPLAINT**

1  capable, able, and committed to the care and oversight of residents such as Decedent
2  GRACE. Such representations were fraudulent. Further, Defendants' conduct was reckless
3  and in conscious disregard of Decedent GRACE's rights and safety.

4       70.     Defendants convinced Decedent GRACE and her family they were able to
5  meet her care needs. Defendants knew those promises and assurances were untrue.
6  Defendants knew the Defendant FACILITY was rated poorly and was in fact a failing facility
7  providing poor care when they made those statements. Defendants knew the Defendant
8  FACILITY was not properly staffed, was not providing proper care, and would not provide
9  proper care to Decedent GRACE. The purpose of their promises and assurances was to
10  induce Decedent GRACE to select Defendant FACILITY purely for financial gain. Their
11  statements were false and were part of Defendants' business model of making fraudulent
12  representations to elderly and dependent persons like Decedent GRACE. This constitutes
13  unfair business practices directed at the elderly.

14       71.     This continual pattern of withholding care and understaffing at Defendant's
15  FACILITY was well known to the Defendants and their officers, directors, and managing
16  agents, Administrator, Director of Nursing, and Medical Director. Upon information and
17  belief, Defendant FACILITY's Administrator, Director of Nursing, and Medical Director
18  routinely reported up the chain of command to corporate managing agents about what was
19  happening on the floor at the nursing home. Upon information and belief, Defendant
20  FACILITY's Administrator, Director of Nursing, and Medical Director also routinely reported
21  admission, discharge and staffing data, and Defendants directed and controlled the staffing
22  budget by allocating resources, setting staffing minimums and maximums, and directing
23  staff to patient ratios. By law, Defendants were responsible for setting policies and
24  procedures to be implemented in the Defendant FACILITY and provide supervision and
25  oversight of administration and nursing services by and through managers and directors.

26       72.     These corporate managing agents had a duty to direct the nurses and staff

COMPLAINT

1  yet did not make the necessary changes at Defendant FACILITY, even with knowledge of
2  substandard care, failures to assess, monitor, and respond to changes in resident condition,
3  inadequate custodial care, inadequate hygiene, and inadequate safety measures at the
4  facility. The managing agents of each Defendant knew or should have known of the lack of
5  proper custodial care to its patients, as well as its understaffing, poor training, and the failure
6  to implement care plans based on internal reporting and also the oversight, monitoring, and
7  reporting of the Department of Public Health.  Any and all findings of the Department of
8  Public Health regarding care failures at Defendant FACILITY were reported up the corporate
9  chain. Despite each Defendant's conscious knowledge of these conditions, the managing
10  agents of each Defendant did not take appropriate and adequate steps to prevent and
11  correct them, and they did not inform Decedent GRACE or her family of what they knew
12  about these dangerous conditions.

13     73.    Defendants, and their officers, directors and managing agents of the
14  Defendants' FACILITY, including the Administrator, Director of Nursing, and Medical
15  Director, knew or should have known that the Defendants' FACILITY's operation was
16  designed in a manner so as to maximize profitability by circumventing the legal duty to
17  assure the health, safety, and oversight of residents such as Decedent GRACE and, in
18  particular, the duty to hire competent employees, to train those employees and to terminate
19  or discipline employees for misconduct towards the residents, including Decedent GRACE.
20  As a result, Defendants' and their officers, directors, and managing agents, including the
21  Administrator, Director of Nursing, and Medical Director, had knowledge of, ratified and/or
22  otherwise authorized all of the acts or omissions, which caused the injuries to Decedent
23  GRACE.

24     74.    LVNs are per se "unfit" to perform the functions of an RN, just as an RN is
25  per se "unfit" to perform the functions of a medical doctor. Here, Defendants authorized and
26  ratified the use of LVNs to perform assessments that they were not licensed or qualified to

27

28

19

**COMPLAINT**

1 perform. As a direct and proximate result of using unfit LVNs to perform assessments, the
2 LVN-based assessments and care plans done for Decedent GRACE were incomplete and
3 inadequate and resulted in Decedent GRACE not getting the interventions she needed to
4 prevent her becoming dehydrated, malnourished, developing respiratory
5 infection/syndrome, and dying.

6      75. As a proximate result of the abuse and neglect of Decedent GRACE by
7 Defendant LVNs, and each of them, Decedent GRACE died on October 6, 2020.

8      76. As a proximate result of the abuse and neglect of Decedent GRACE by
9 Defendants and each of them, she was caused to incur medical expenses and other related
10 expenses, all to her special damages in a sum to be established.

11      77. As a proximate result of the abuse and neglect of Decedent GRACE by
12 Defendants, and each of them, she suffered fear, anxiety, humiliation, physical pain and
13 discomfort, and emotional distress, all to her general damages in a sum to be established.

14      78. By the conduct, acts and omissions of Defendants, and each of them, as
15 alleged above, they are guilty of recklessness, fraud, oppression, and/or malice. The
16 specific facts set forth above show a disregard of the high probability that Decedent GRACE
17 would be injured. In addition to special damages, Plaintiff is therefore entitled to an award
18 of the reasonable attorney's fees and costs incurred in prosecuting this case as well as
19 Decedent GRACE's pain and suffering and punitive damages pursuant to Welfare &
20 Institutions Code § 15657 and Civil Code § 3294.

21
22 **SECOND CAUSE OF ACTION**
23 **VIOLATION OF PATIENT RIGHTS**
24 **[Health & Safety Code § 1430(b)]**
25 **(Against Defendants GLAD INVESTMENTS, INC. dba RIVERSIDE CONVALESCENT
HOSPITAL and DOES 1-25)**
26
27      79. Plaintiff incorporates by reference Paragraphs 1 through 78 of this Complaint

20
28 COMPLAINT

1 | as though fully set forth.

2 |     80.    The acts and omissions of Defendants alleged above constitute violations of
3 | patients' rights within the meaning of Health and Safety Code § 1430(b). This statute allows
4 | a current or former resident to pursue damages, attorney's fees, and an injunction for
5 | violations of patients' rights set forth in Title 22 of the California Code of Regulations § 72527
6 | and other state and federal laws and regulations.

7 |     81.    Here, Defendants' conduct as described in the foregoing sections violated
8 | several of Decedent GRACE's statutory rights, including but not limited to:

9 |     a. Right to be treated with consideration, respect, and full recognition of
10 |     dignity (Cal. Code Regs., tit. 22, § 72527(a)(12));

11 |     b. Right to have individualized individual care needs identified based on
12 |     assessment of patient's needs with input from patient and, if necessary,
13 |     health professionals involved in the care of the patient (Cal. Code Regs.,
14 |     tit. 22, § 72311(a)(1)(A)); 42 C.F.R. §§ 19   483.10(f),  483.20(b)(1);  42
15 |     U.S.C. § 1395i-3(b)(3));

16 |     c. Right to receive care as implemented by individualized written patient
17 |     care plan indicating the care to be given, objectives to be accomplished,
18 |     and the professional discipline responsible for each element of care (Cal.
19 |     Code Regs., tit. 22, § 72311(a)(1)(B); 42 C.F.R. § 483.10(c));

20 |     d. Right to have patient care plans reviewed, evaluated, and updated as
21 |     necessary and more often if there is a change of the patient's condition
22 |     (Cal. Code Regs., tit. 22, § 26 72311(a)(1)(C));

23 |     e. Right to receive care as implemented by the patient care plan according
24 |     to the methods indicated (Cal. Code Regs., tit. 22, § 72311(a)(2); 42
25 |     U.S.C. § 1395i-3(b)(4));

26 |     f. Right to receive care pursuant to physician's orders in the administration

27 |              21

28 | **COMPLAINT**

1  Decedent GRACE; negligently and carelessly failing to take appropriate measures to
2  prevent injury to Decedent GRACE; negligently and carelessly failing to adequately assess
3  the care needs of Decedent GRACE; negligently and carelessly failing to adequately
4  implement appropriate interventions to address the care needs of Decedent GRACE;
5  negligently and carelessly failing to have appropriate policies and procedures in place and
6  for failing to follow appropriate policies and procedures; and/or negligently and carelessly
7  failing to otherwise care for and treat Decedent GRACE consistent with the standard of
8  care, which upon information and belief, will be disclosed through discovery in the course
9  of this litigation.

10     87.    As a direct and proximate result of these tortious acts, omissions, and/or
11 conduct of Defendants, Plaintiff was damaged, injured, and harmed, all of which have
12 caused Decedent GRACE great mental, physical and emotional distress, pain and
13 suffering, all to Plaintiffs' damage in a sum to be determined according to proof at the time
14 of trial.

15                     **FOURTH CAUSE OF ACTION**

16                         **WRONGFUL DEATH**

17 **(Against Defendants GLAD INVESTMENTS, INC. dba RIVERSIDE CONVALESCENT
   HOSPITAL; THE GLADYS V. JENNINGS REVOCABLE TRUST, and DOES 1-25)**
18

19     88.    Plaintiff incorporates by reference Paragraphs 1 through 87 of this Complaint
20 as though fully set forth.

21     89.    Plaintiff TERRY is the surviving heir and natural son of Decedent GRACE.

22     90.    As a proximate result of the conduct alleged above, perpetrated by
23 Defendants, Decedent GRACE died on October 6, 2020.

24     91.    Prior to the death of Decedent GRACE, Plaintiff TERRY enjoyed the love,
25 society, comfort, and attention of his mother.

26     92.    As a proximate result of the wrongful act of Defendants, as alleged herein,
27 which caused the death of Decedent GRACE, Plaintiff TERRY sustained pecuniary loss of

28

1 | the love, comfort, companionship, solace, society, training, guidance, and attention of
2 | Decedent GRACE, in a sum according to proof at trial.

3 | ///

## RELIEF REQUESTED / PRAYER

1. On the First Cause of Action:

   a. For compensatory damages in an amount in excess of the minimum jurisdiction of this court to be ascertained at the time of trial; and

   b. For special damages including past hospital, medical, professional, and incidental expenses, according to proof; and

   c. For interest on any compensatory damages;

   d. For attorney's fees and costs pursuant to Welfare & Institutions Code § 15657 and according to proof; and

   e. For punitive and/or exemplary damages pursuant to Welfare & Institutions Code § 15657 and Civil Code § 3294; and

   f. For treble damages pursuant to Civil Code § 3345;

2. On the Second Cause of Action:

   a. For statutory damages according to proof pursuant to Health & Safety Code § 1430(b); and

   b. For attorney's fees and costs pursuant to Health & Safety Code § 1430(b);

3. On the Third and Fourth Causes of Action:

   a. For compensatory damages in an amount in excess of the minimum jurisdiction of this court to be ascertained at the time of trial; and

   b. For special damages including funeral and burial expenses, medical and incidental expenses according to proof; and

   c. For interest on any compensatory damages;

4. On all counts

   a. For costs of suit; and

25

**COMPLAINT**

1                b.  Whatever further relief the court may find just and proper.

2

3  DATED: October 6, 2021          **THE BARNES FIRM, LC**

4

5

6                         By:

7                              Christian R. Oliver

8                              Attorneys for Plaintiffs

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

26

**COMPLAINT**

1
2
<u>**DEMAND FOR JURY TRIAL**</u>
3
4
Plaintiff hereby demands a trial by jury.
5
6
DATED: October 6, 2021                     **THE BARNES FIRM, LC**
7
8
9
By:
10
Christian R. Oliver
Attorneys for Plaintiffs
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27                                         27
28
**COMPLAINT**

# EXHIBIT B



DEPARTMENT OF HEALTH & HUMAN SERVICES

Office of the Secretary

The General Counsel
Washington, D.C. 20201

August 14, 2020

Thomas Barker
Foley Hoag LLP
1717 K Street, N.W.
Washington, DC 20006-5350

Dear Mr. Barker: *Tom,*

Thank you for your July 20, 2020 letter seeking confirmation that senior living communities are "covered persons" under the Public Readiness and Emergency Preparedness Act, 42 U.S.C. § 247d-6d, (the PREP Act) when performing certain functions during this declared emergency.

For the reasons set forth below, we conclude that senior living communities are "covered persons" under the PREP Act when they provide a facility to administer or use a covered countermeasure in accordance with the Secretary's March 10, 2020 Declaration under the PREP Act. *See* 85 Fed. Reg. 15,198 (March 17, 2020) (Declaration).[1]

Under the PREP Act and the Declaration, "covered persons," when used with respect to the administration or use of a covered countermeasure, "include manufacturers, distributors, program planners, and qualified persons, and their officials, agents, and employees." *Id.* at 151,199; *see also* 42 U.S.C. § 247d-6d(i)(2). The statute defines "program planner" as a

> State or local government, including an Indian tribe, a person employed by the State or local government, or other person who supervised or administered a program with respect to the administration, dispensing, distribution, provision, or use of a security countermeasure or a qualified pandemic or epidemic product, including a person who has established requirements, provided policy guidance, or supplied technical or scientific advice or assistance or provides a facility to administer or use a covered countermeasure in accordance with a declaration under subsection (b).

42 U.S.C. § 247d-6d(i)(6).

---

[1] This letter addresses only whether senior living communities can be "covered persons." To receive PREP Act immunity, the covered person must satisfy other requirements of the PREP Act and the Secretary's declaration under the Act.

Thomas Barker
August 14, 2020
Page 2

The Declaration incorporates this definition, and its preamble explains that a program planner can be a "private sector employer or community group" that "carries out the described activities." 85 Fed. Reg. at 15,201. Thus, a senior living community meets the definition of a "program planner" to the extent that it supervises or administers a program with respect to the administration, dispensing, distribution, provision, or use of a security countermeasure or a qualified pandemic or epidemic product, including by "provid[ing] a facility to administer or use a Covered Countermeasure in accordance with" the Declaration.

This letter sets forth the current views of the Office of the General Counsel.[2]  It is not a final agency action or a final order.  Nor does it bind HHS or the federal courts.  It does not have the force or effect of law.[3]

Sincerely yours,

Robert P. Charrow
General Counsel

---

[2] See Air Brake Sys., Inc. v. Mineta, 357 F.3d 632, 647-48 (6th Cir. 2004) (holding that the Chief Counsel of the National Highway Traffic Safety Administration had delegated authority to issue advisory opinions to regulated entities in fulfillment of a congressional directive to promote regulatory compliance); 5 U.S.C. § 301 ("The head of an executive department . . . may prescribe regulations for the government of his department, the conduct of its employees, [and] the distribution and performance of its business[.]").

[3] It is possible that a senior living community could also be a "qualified person."  Under the PREP Act, "qualified person" includes a "person within a category of persons so identified in" a PREP Act declaration. 42 U.S.C. § 247d-6d(i)(8). The Declaration defined "qualified person" to include "[a]ny person authorized in accordance with the public health and medical emergency response of the Authority Having Jurisdiction…to prescribe, administer, deliver, distribute or dispense the Covered Countermeasures, and their officials, agents, employees, contractors, and volunteers." 85 Fed. Reg. at 15,201-15,202. To the extent a senior living community were so authorized, it could be a qualified person.

# EXHIBIT C

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Guidance**
Office of the Secretary

Office of the Assistant Secretary for Health
Washington, D.C. 20201

U.S. Department of Health & Human Services
Office of the Assistant Secretary for Health
August 31, 2020

### Guidance for PREP Act Coverage for COVID-19 Screening Tests at Nursing Homes, Assisted-Living Facilities, Long-Term-Care Facilities, and other Congregate Facilities

On January 31, 2020, the Secretary of Health and Human Services declared that the 2019 novel coronavirus (COVID-19) is a public-health emergency for the United States.[1] The United States Department of Health and Human Services (HHS) is the lead agency for the federal government's response to the COVID-19 pandemic.

A key component of that response is rapidly expanding COVID-19 testing across America. Within HHS, the Office of the Assistant Secretary for Health leads federal efforts to support that expansion. Enhancing the safety of nursing homes, assisted-living facilities, long-term-care facilities, and other facilities where people congregate to receive care or education or to work (collectively, "congregate facilities") is critical for our Nation's response to the COVID-19 pandemic. Testing for COVID-19, including those who are asymptomatic, is a key part of that effort.[2]

---

[1] The Secretary's declaration of a public health emergency was retroactively effective on January 27, 2020.

[2] *See, e.g.*, Interim SARS-CoV-2 Testing Guidelines for Nursing Home Residents and Healthcare Personnel, available at https://www.cdc.gov/coronavirus/2019-ncov/hcp/nursing-homes-testing.html (last visited Aug. 29, 2020) (explaining that, in addition to nursing homes, "testing residents with signs or symptoms of COVID-19 and testing asymptomatic close contacts should also be applied to other long-term care facilities (e.g., assisted living facilities, intermediate care facilities for individuals with intellectual disabilities, institutions for mental disease, and psychiatric residential treatment facilities)"); Testing in Institutions of Higher Education, available at https://www.cdc.gov/coronavirus/2019-ncov/community/colleges-universities/ihe-testing.html (last visited Aug. 29, 2020) ("In areas with moderate to substantial community transmission where resources allow, local health officials and [institutions of higher learning] may consider testing some or all asymptomatic students, faculty, and staff who have no known exposure (e.g., students in congregate housing such as residence halls) to identify outbreaks and inform control measures."); Testing asymptomatic individuals without known or suspected exposure to SARS-CoV-2 for early identification in special settings, available at https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/testing-non-healthcare-workplaces.html#testing-3 (last visited Aug. 29, 2020) ("Viral testing of workers without symptoms may be useful to detect COVID-19 early and stop transmission quickly, particularly in areas with moderate to substantial community transmission.").

---

Both the Food and Drug Administration (FDA) and the Centers for Medicare & Medicaid Services (CMS) have issued guidance and provided other information regarding screening asymptomatic individuals, including in congregate settings.

According to FDA,

> For health care providers who are ordering an authorized SARS-CoV-2 diagnostic test to be used off-label (outside the authorization) to screen asymptomatic individuals not suspected of having COVID-19, we recommend they consider the information below.  Although the current available literature suggests that symptomatic individuals with COVID-19 and asymptomatic individuals without known exposure may have similar levels of viral genetic material, there is limited data on the distribution of viral loads in individuals with and without symptoms across demographics, different settings, and specimen types.  Therefore, when screening asymptomatic individuals, health care providers should consider using a highly sensitive test, especially if rapid turnaround times are available.  If highly sensitive tests are not feasible, or if turnaround times are prolonged, health care providers may consider use of less sensitive point-of-care tests, even if they are not specifically authorized for this indication (commonly referred to as "off-label").  For congregate care settings, like nursing homes or similar settings, repeated use of rapid point-of-care testing may be superior for overall infection control compared to less frequent, highly sensitive tests with prolonged turnaround times.[3]

CMS has concluded that

> [it] requires facilities with a CLIA Certificate of Waiver to follow the manufacturer's instructions (Instructions For Use) when performing laboratory testing.  The FDA has granted Emergency Use Authorizations (EUA) to certain antigen tests for testing specimens from individuals who are suspected of COVID-19 by their healthcare provider within a number of days after the onset of symptoms, specific to each authorized test's validated performance.  The FDA has provided recommendations for health care providers who are ordering authorized tests outside their authorization (e.g., antigen tests for asymptomatic individuals)— see FDA's FAQ on Testing for SARS-CoV-2 ("Q: Does the FDA have recommendations for health care providers using SARS-CoV-2 diagnostic tests for screening asymptomatic individuals for COVID-19?") for further information.

> CMS will temporarily exercise enforcement discretion for the duration of the COVID-19 public health emergency under CLIA for the use of SARS-CoV-2 POC antigen tests on asymptomatic individuals.  Specifically, CMS will not cite facilities with a CLIA Certificate of Waiver when SARS-CoV-2 POC antigen tests are performed on asymptomatic individuals, as described in the FDA FAQ.[4]

Therefore, as an Authority Having Jurisdiction under the Secretary's March 10, 2020 declaration under the Public Readiness and Emergency Preparedness Act (PREP Act),[5] Assistant Secretary for

---

[3] General FAQs, Q: Does the FDA have recommendations for health care providers using SARS-CoV-2 diagnostic tests for screening asymptomatic individuals for COVID-19?, available at https://www.fda.gov/medical-devices/coronavirus-covid-19-and-medical-devices/faqs-testing-sars-cov-2#general, (last visited Aug. 29, 2020).

[4] What is CMS's policy regarding laboratories performing antigen tests authorized by the Food and Drug Administration (FDA) under an Emergency Use Authorization (EUA) for use at the point of care (POC) or in patient care settings operating under a Clinical Laboratory Improvement Amendments of 1988 (CLIA) Certificate of Waiver on asymptomatic individuals?, available at https://www.cms.gov/files/document/clia-poc-ag-test-enforcement-discretion.pdf (last visited Aug. 29, 2020).

[5] Declaration Under the Public Readiness and Emergency Preparedness Act for Medical

Health, Admiral Brett P. Giroir, M.D., extends coverage under the PREP Act to licensed health-care practitioners prescribing or administering point-of-care COVID-19 tests, using anterior nares specimen collection or self-collection, for screening in congregate facilities across the Nation. Such tests must be authorized, approved, or cleared by the FDA (collectively, FDA-authorized COVID-19 tests).

PREP Act coverage encompasses licensed health-care practitioners prescribing or administering FDA-authorized COVID-19 tests, including for off-label (outside the authorization) use to screen asymptomatic individuals in congregate facilities.[6]

In addition to the requirements set forth herein, licensed health-care practitioners must comply with the requirements of the PREP Act and the conditions of the Secretary's declaration under the PREP Act in order to receive PREP Act coverage.[7]

This PREP Act coverage preempts any State or local provision of law or legal requirement that prohibits or effectively prohibits such licensed health-care practitioners from administering or prescribing FDA-authorized COVID-19 tests to symptomatic or asymptomatic individuals at congregate facilities.[8]

---

Countermeasures Against COVID–19, 85 Fed. Reg. 15,198 (Mar. 17, 2020).

[6] FDA determines the scope of on-label authorization.

[7] *See, e.g.*, Advisory Opinion on the Public Readiness and Emergency Preparedness Act and the Secretary's Declaration under the Act, available at https://www.hhs.gov/sites/default/files/prep-act-advisory-opinion-hhs-ogc.pdf (last visited Aug. 29, 2020).

[8] *See, e.g.*, Advisory Opinion 20-02 on the Public Readiness and Emergency Preparedness Act and the Secretary's Declaration under the Act, available at https://www.hhs.gov/sites/default/files/advisory-opinion-20-02-hhs-ogc-prep-act.pdf (last visited Aug. 29, 2020).

# EXHIBIT D



DEPARTMENT OF HEALTH & HUMAN SERVICES                    Office of the Secretary
_____

The General Counsel
Washington, D.C. 20201

# ADVISORY OPINION 21-01 ON THE
## PUBLIC READINESS AND EMERGENCY PREPAREDNESS ACT
### SCOPE OF PREEMPTION PROVISION
### JANUARY 8, 2021

Following the issuance by the Secretary on December 3, 2020, of the Fourth Amendment to his Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19, we have received questions as to whether the PREP Act applies where a covered person declined to use a covered countermeasure when it arguably ought to have been used.[1]  *See* 85 Fed. Reg. 79,190 (Dec. 9, 2020).  These inquiries were stimulated, as we understand, by a spate of recent lawsuits, most involving nursing homes and other healthcare facilities, where patients or their estates allege that patients contracted COVID-19 because the facility, among other things, failed to provide its staff with personal protective equipment ("PPE"), failed to teach the staff how to properly use that equipment, or failed to ensure that its staff used the PPE that it had been given.  This Advisory Opinion addresses these questions in the context of our administration of the PREP Act and the Secretary's PREP Act Declaration, as amended.

## I.    Analysis

There has been a growing number of suits related to the use or non-use of covered countermeasures against COVID-19, including PPE.  These cases tend to be filed in state courts alleging a variety of state law-based torts.  In this "jurisprudential Kabuki dance" (*Maine Public Utilities Com'n v. F.E.R.C.*, 625 F.3d 754, 758 (D.C. Cir. 2010)), defendants file removal petitions and plaintiffs respond with remand motions.  To resolve the remand motions, courts first assess whether the doctrine of complete preemption applies.  Ordinary preemption is a defense and does not support Article III subject matter jurisdiction (usually under 28 U.S.C. § 1331), a prerequisite for removal.  *See Merrell Dow Pharmaceuticals v. Thompson*, 478 U.S. 804 (1986).  In contrast, complete preemption is "really a jurisdictional rather than a preemption doctrine, [as it] confers exclusive federal jurisdiction in certain instances where Congress intended the scope of a federal law to be so broad as to entirely replace any state-law claim." *Marin General Hosp. v. Modesto & Empire Traction Co*., 581 F.3d 941, 945 (9th Cir. 2009) (quoting *Franciscan Skemp Healthcare, Inc. v. Cent. States Joint Bd. Health & Welfare Trust Fund,* 538 F.3d 594, 596 (7th Cir. 2008) (internal quotations omitted).  Relatively few statutes completely preempt.

---

[1]    The PREP Act is the Public Readiness and Emergency Preparedness Act, Pub. L. No. 109-148, div. C, § 2, 119 Stat. 2818 (Dec. 30, 2005), codified at 42 U.S.C. §§ 247d-6d, 247d-6e. It has been amended through the Pandemic and All-Hazards Preparedness Reauthorization Act of 2013, Pub. L. No. 113–5, title IV, § 402(g)(2), (3), 127 Stat. 196 (Mar. 13, 2013) and further amended by § 6005 of the Families First Coronavirus Response Act, Pub. L. No. 116-127, 134 Stat. 177 (March 18, 2020) and § 3103 of the Coronavirus Aid Relief, and Economic Security Act, Pub. L. No. 116-136, 134 Stat. 281 (March 27, 2020).

**A.      The PREP Act is a "Complete Preemption" Statute**

The Supreme Court first articulated the doctrine of complete preemption as a basis for federal question removal jurisdiction under 28 U.S.C. § 1441(a) in *Avco Corp. v. Aero Lodge No. 735, Intern. Ass'n of Machinists and Aerospace Workers*, 390 U.S. 557, 559 (1968) (holding that the Labor Management Relations Act, 1947 completely preempted state court jurisdiction). Thereafter, the doctrine was extended to the Employee Retirement Income Security Act of 1974 in 1987, the National Bank Act in 2003, and the Air Transportation Safety and System Stability Act in 2005. *See Metropolitan Life Insurance Co. v. Taylor*, 481 U.S. 58 (1987) (ERISA completely preempts state law); *Aetna Health Inc. v. Davila*, 542 U.S. 200 (2004) (the same); *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 7–11 (2003) (National Bank Act completely preempts); *In re WTC Disaster Site*, 414 F.3d 352, 375 (2d Cir. 2005) (Air Transportation Safety and System Stability Act completely preempted state claims and ousted state courts of jurisdiction by creating an exclusive federal cause of action). The *sine qua non* of a statute that completely preempts is that it establishes either a federal cause of action, administrative or judicial, as the only viable claim or vests exclusive jurisdiction in a federal court. The PREP Act does both.

Once complete preemption attaches, the district court is usually obligated to dismiss the case as pleaded, either because no federal cause of action is alleged or the exclusive initial venue is a federal administrative agency.

All that is well and good, but it does not address the issue that appears to have perplexed district courts, namely when is the PREP Act triggered. District courts appear to have labored hard attempting to ordain whether the non-use of a covered countermeasure triggers the PREP Act and its complete preemption regime. At one extreme, plaintiff may have pleaded that the facility failed *in toto* to provide any of its staff or patients with any PPE, a covered countermeasure if NIOSH approved or FDA cleared or waived. Other plaintiffs allege that the quantity of PPE was inadequate, that staff were not timely provided PPE or that staff were not adequately trained to use PPE. The latter three complaints reflect many of the complaints that we have reviewed.

The PREP Act's immunity provision, which triggers exclusive federal jurisdiction, states as follows:

> Subject to the other provisions of this section, a covered person shall be immune from suit and liability under Federal and State law with respect to all claims for loss caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure if a declaration under subsection (b) has been issued with respect to such countermeasure.

Public Health Service Act § 319F-3(a)(1), 42 U.S.C. § 247d-6d(a)(1) (emphasis supplied).

The PREP Act goes on to provide that its immunity

> applies to any claim for loss that has a causal relationship with the administration to or use by an individual of a covered countermeasure, including a causal

relationship with the design, development, clinical testing or investigation, manufacture, labeling, distribution, formulation, packaging, marketing, promotion, sale, purchase, donation, dispensing, prescribing, administration, licensing, or <u>use</u> of such countermeasure.

*Id*. at § 319F-3(a)(2)(B), 42 U.S.C. § 247d-6d(a)(2)(B) (emphasis supplied).

Some district courts have interpreted the scope of the immunity in subparagraph (B) as requiring "use." Under this view, if a covered countermeasure were not used, then there is no PREP Act immunity. According to one court, "[t]here is simply no room to read [the PREP Act] as equally applicable to the non-administration or non-use of a covered countermeasure." *Lutz v. Big Blue Healthcare, Inc*., ___F. Supp. 3d ___, 2020 WL 4815100, at *8 (D. Kan. 2020) (emphasis in original) (granted remand motion).

However, this "black and white" view clashes with the plain language of the PREP Act, which extends immunity to anything "relating to" the administration of a covered countermeasure. For example, consider a situation where there is only one dose of a COVID–19 vaccine,[2] and a person in a vulnerable population and a person in a less vulnerable population both request it from a healthcare professional. In that situation, the healthcare professional administers the one dose to the person who is more vulnerable to COVID–19. In that circumstance, the failure to administer the COVID–19 vaccine to the person in a less-vulnerable population "relat[es] to . . . the administration to" the person in a vulnerable population. The person in the vulnerable population was able to receive the vaccine only because it was not administered to the person in the less-vulnerable population. Prioritization or purposeful allocation of a Covered Countermeasure, particularly if done in accordance with a public health authority's directive, can fall within the PREP Act and this Declaration's liability protections. There can potentially be other situations where a conscious decision not to use a covered countermeasure could relate to the administration of the countermeasure. In contrast, the failure to purchase any PPE, if not the outcome of some form of decision-making process may not be sufficient to trigger the PREP Act.

Where a facility has been allocated a scarce therapeutic purchased by the federal government and that facility fails to administer that therapeutic to an individual who meets the requirements of the FDA's authorization, approval, or license, and whose physician prescribes that therapeutic, then the facility's refusal to administer that therapeutic could still trigger the PREP Act assuming the non-use of the therapeutic was the result of conscious decision-making. However, the facility may still be liable under the PREP Act, if the plaintiff alleges that the decision to deny him or her the therapeutic was wanton and willful and resulted in death or serious injury. *See* 42 U.S.C. § 247d-6d(d)-(e). Such a case would be transferred to the District Court for the District of Columbia for resolution by a three-judge panel. The facility may also be subject to a federal enforcement action.

---

[2] For simplicity, this example assumes a patient only requires one dose of the vaccine.

The language of the PREP Act itself supports a distinction between allocation which results in non-use by some individuals, on the one hand, and nonfeasance, on the other hand, that also results in non-use.

Included within the set of "covered persons," *i.e.*, those entitled to immunity, are "program planners." 42 U.S.C. § 247d-6d(i)(2)(B)(iii). A "program planner" is

> a State or local government, including an Indian tribe, a person employed by the State or local government, or other person who supervised or administered a program with respect to the administration, dispensing, distribution, provision, or use of a security countermeasure or a qualified pandemic or epidemic product, including a person who has established requirements, provided policy guidance, or supplied technical or scientific advice or assistance or provides a facility to administer or use a covered countermeasure in accordance with a declaration under subsection (b).

*Id.* at § 247d-6d(i)(6).

A program planner is someone who is involved in providing or allocating covered countermeasures. Program planning inherently involves the allocation of resources and when those resources are scarce, some individuals are going to be denied access to them. Therefore, decision-making that leads to the non-use of covered countermeasures by certain individuals is the grist of program planning, and is expressly covered by PREP Act

There are going to be circumstances where plaintiff pleads that defendant's culpability is the result of its failure to make any decisions whatsoever, thereby abandoning its duty to act as a program planner or other covered person. Although this is a small hole through which to wiggle to avoid complete preemption, we are confident, were it not for two legal constraints, that it would grow as plaintiffs become more adept at fashioning their pleadings. However, "complete preemption . . . functions as an exception to the well-pleaded complaint rule." *Giles v. NYLCare Health Plans*, *Inc.*, 172 F.3d 332, 336 (5th Cir. 1999). Thus, federal courts are free to entertain discovery to ascertain, for jurisdictional purposes, the facts underlying the complaint. *See United Surgical Assistants, LLC v. Aetna Life Ins. Co.*, 2014 WL 4059889, at *1 (M.D. Fla. Aug. 14, 2014) (allowing jurisdictional discovery on whether plaintiff's claim was completely preempted by ERISA).

**B.      Fourth Amendment to the Secretary's Declaration Supports the *Grable* Doctrine**

In addition to complete preemption as the basis for article III jurisdiction and removal, the Court recognized a separate doctrine in *Grable & Sons Metal Products, Inc. v. Darue Engineering & Mfg.*, 545 U.S. 308 (2005). Under *Grable*, even in the absence of a claim arising under federal law, "a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law, and thus justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." *Grable & Sons Metal Products, Inc. v. Darue Engineering & Mfg.*, 545 U.S. 308, 312 (2005) (emphasis supplied). Thus, a substantial federal question is implicated, for example, where "the

interpretation of a federal statute [ ] actually is in dispute in the litigation and is so important that it sensibly belongs in federal court." 545 U.S. at 315. Here, ordaining the metes and bounds of PREP Act protection in the context of a national health emergency necessarily means that the case belongs in federal court. The Secretary, in his Fourth Amendment to his PREP Declaration, similarly concluded, when he stated that

> [t]here are substantial federal legal and policy issues, and substantial federal legal and policy interests within the meaning of *Grable & Sons Metal Products, Inc. v. Darue Eng'g. & Mf'g*., 545 U.S. 308 (2005), in having a unified, whole-of-nation response to the COVID–19 pandemic among federal, state, local, and private-sector entities.

85 Fed. Reg. at 79,197 (col. c).

*See also* 42 U.S.C. § 247d-6d(b)(7) ("No court of the United States, or of any State, shall have subject matter jurisdiction to review, whether by mandamus or otherwise, any action by the Secretary under this subsection."). As such, the secretarial determination provides the underlying basis for invoking the *Grable* doctrine with respect to all claims for loss caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure. Once invoked, the court retains the case to decide whether the immunity and preemption provisions apply; if they do not apply, then the court would try the case as it would a diversity case. If the court finds, though, that the PREP Act applies, it would dismiss the case or if death or serious physical injury proximately caused by willful misconduct is alleged, transfer it to the District Court for the District of Columbia. *See* 42 U.S.C. § 247d-6d(d)-(e).

## II.    Limitations

This Advisory Opinion may be supplemented or modified. It is intended to minimize the need for individual advisory opinions. This Advisory Opinion sets forth the current views of the Office of the General Counsel.[3] It is not a final agency action or a final order. It does not have the force or effect of law.

*Robert P. Charrow*

Robert P. Charrow
General Counsel
January 8, 2021

---

[3]      *See Air Brake Sys., Inc. v. Mineta*, 357 F.3d 632, 647–48 (6th Cir. 2004) (holding that the Chief Counsel of the National Highway Traffic Safety Administration had delegated authority to issue advisory opinions to regulated entities in fulfillment of a congressional directive to promote regulatory compliance); 5 U.S.C. § 301 ("The head of an executive department . . . may prescribe regulations for the government of his department, the conduct of its employees, [and] the distribution and performance of its business[.]"); *Statement of Organization, Functions, and Delegations of Authority*, 85 Fed. Reg. 54,581, 54,583 (Sept. 2, 2020).

# EXHIBIT E

| Attorney or Party without Attorney: | For Court Use Only |
|---|---|
| Allen R. Oghassabian, Esq. (SBN 292653)<br>THE BARNES FIRM<br>655 W. Broadway, Suite 940<br>San Diego, CA 92101<br>  Telephone No:  800-800-0000<br><br>  Attorney For:  Plaintiffs | **F I L E D**<br>Superior Court of California<br>County of Butte<br>**2/10/2022**<br><br>*Sharif Elmallah*, Clerk<br>By _____ Deputy<br>*Electronically FILED* |

| | Ref. No. or File No.:<br>20-01763-CA |
|---|---|

Insert name of Court, and Judicial District and Branch Court:
SUPERIOR COURT OF THE STATE OF CALIFORNIA COUNTY OF BUTTE

Plaintiff:  Grace Shumlai, deceased, by through her personal legal representative and successor in interest, Terry Lewis, et al.

Defendant:  Glad Investments, Inc. dba Riverside Convalescent Hospital, a California Skilled Nursing Facility, et al.

| PROOF OF SERVICE SUMMONS | Hearing Date:<br>March 30, 2022 | Time:<br>10:30am | Dept/Div: | Case Number:<br>21CV02507 |
|---|---|---|---|---|

1.  *At the time of service I was at least 18 years of age and not a party to this action.*

2.  I served copies of the Summons; Complaint for Damages; Notice of Case Assignment and Case Management Conference; Ex Parte Application for Extension of Time to Serve Pleading and Order Extending Time to Serve; Civil Case Cover Sheet

3.  *a.  Party served:*      ERETZ CHICO PROPERTIES, LLC
    *b.  Person served:*    JESSICA OLAH, DIRECTOR OF NURSING (Caucasian,Female, 40s, Brown Hair, 5'8", 160 Pounds)

4.  *Address where the party was served:*    375 Cohasset Road, Chico, CA 95926

5.  *I served the party:*
    a. **by personal service.**    I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date)*: Thu, Feb 03 2022 (2) at *(time)*: 02:23 PM
    (1)  [ X ]  **(business)**
    (2)  [   ]  **(home)**
    (3)  [   ]  **(other)** :

6.  The "Notice to the Person Served" (on the summons) was completed as follows:
    a.  [   ]  as an individual defendant.
    b.  [   ]  as the person sued under the fictitious name of *(specify)*:
    c.  [   ]  as occupant.
    d.  [ X ]  On behalf of *(specify)*:   ERETZ CHICO PROPERTIES, LLC
        under the following Code of Civil Procedure section:
        [   ]  416.10 (corporation)          [   ]  415.95 (business organization, form unknown)
        [   ]  416.20 (defunct corporation)  [   ]  416.60 (minor)
        [   ]  416.30 (joint stock company/association)  [   ]  416.70 (ward or conservatee)
        [   ]  416.40 (association or partnership)  [   ]  416.90 (authorized person)
        [   ]  416.50 (public entity)        [   ]  415.46 (occupant)
        [ X ]  other:    limited liability company



| Judicial Council Form POS-010<br>Rule 2.150.(a)&(b) Rev January 1, 2007 | PROOF OF<br>SERVICE<br>SUMMONS | 6632305<br>(15024797)<br>Page 1 of 2 |
|---|---|---|

| Attorney or Party without Attorney: | For Court Use Only |
|---|---|
| Allen R. Oghassabian, Esq. (SBN 292653)<br>THE BARNES FIRM<br>655 W. Broadway, Suite 940<br>San Diego, CA 92101<br>　Telephone No: 800-800-0000<br><br>　Attorney For: Plaintiffs | |
| Ref. No. or File No.:<br>20-01763-CA | |

| Insert name of Court, and Judicial District and Branch Court: |
|---|
| SUPERIOR COURT OF THE STATE OF CALIFORNIA COUNTY OF BUTTE |

Plaintiff: Grace Shumlai, deceased, by through her personal legal representative and successor in interest, Terry Lewis, et al.

Defendant: Glad Investments, Inc. dba Riverside Convalescent Hospital, a California Skilled Nursing Facility, et al.

| PROOF OF SERVICE SUMMONS | Hearing Date:<br>March 30, 2022 | Time:<br>10:30am | Dept/Div: | Case Number:<br>21CV02507 |
|---|---|---|---|---|

Recoverable cost Per CCP 1033.5(a)(4)(B)

7. **Person who served papers**
   a. Name: Tyler Pochop
   b. Address: **c/o FIRST LEGAL**
      530 B Street, Suite 1050
      SAN DIEGO, CA 92101
   c. Telephone number: (619) 231-9111
   d. **The fee** for service was: $106.20
   e. I am:
      (1) ☐ A Registered California Process Server.
      (2) ☐ exempt from registration under Business and Professions Code section 22350(b).
      (3) ☒ a registered California process server:
         (i) ☐ owner ☐ employee ☒ independent contractor
         (ii) Registration No: 277
         (iii) County: Shasta County

8. *I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.*

02/04/2022
*(Date)*

*Tyler Pochop*

Tyler Pochop


Judicial Council Form POS-010
Rule 2.150.(a)&(b) Rev January 1, 2007

PROOF OF
SERVICE
SUMMONS

6632305
(15024797)
Page 2 of 2